John Buse (SBN 163156)
Ross Middlemiss (SBN 323737)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800, Oakland, CA 94612
Tel: 510-844-7100
Fax: 510-844-7150
Email: jbuse@biologicaldiversity.org
        rmiddlemiss@biologicaldiversity.org

Attorneys for Plaintiffs AquAlliance and Center for Biological Diversity

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AQUALLIANCE; and CENTER FOR BIOLOGICAL DIVERSITY, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| U.S. FISH AND WILDLIFE SERVICE; U.S. ARMY CORPS OF ENGINEERS; COLONEL JAMES HANDURA, in his official capacity as District Commander of the U.S. Army Corps of Engineers; and DEB HAALAND, in her official capacity as Secretary of the Interior. | |
| Defendants. | |

1

**INTRODUCTION**

1.      Plaintiffs AQUALLIANCE and CENTER FOR BIOLOGICAL (collectively, "Plaintiffs") challenge the federal government's approval and permitting of the proposed Stonegate Development Project (the "Project") within the City of Chico in Butte County, California. The Project—a proposed 314-acre multi-use development with 423 single-family residences, 13.4 acres of multi-family dwellings and 36.6 acres of commercial uses that would result in the loss of nearly half of the 20.19 acres of wetlands on the Project site—would have profound and irreversible environmental consequences, particularly for seasonal wetlands known as vernal pools that are found on the Project site, and on the endangered and threatened species that rely on these vernal pools. The vernal pool habitats on and around the Project site are well known in Butte County, and local advocates, residents and government agencies have all identified the value of this area in sustaining listed species, particularly the incredibly rare Butte County meadowfoam and declining vernal pool fairy shrimp and vernal pool tadpole shrimp.

2.      Plaintiffs challenge the U.S. Fish and Wildlife Service's (the "Service") review and approval of the Project under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*. Specifically, Plaintiffs challenge the Service's January 23, 2020 Biological Opinion for the Project as arbitrary and capricious because the Biological Opinion failed to adequately describe the Project's effect on listed species and did not provide sufficient mitigation for the Project's impacts on listed species, and thus failed to support its conclusion that the Project would not jeopardize the continued survival and recovery of the listed species that will be adversely affected by the Project. Plaintiffs also challenge the Corps' failure to initiate consultation regarding potential Project impacts on a listed species, the giant garter snake, that is known to inhabit the Project area, but was ignored by the Service when it reviewed the impacts of the Project on protected species.

3.      Plaintiffs further challenge the Corps' failure to prepare a full environmental impact statement ("EIS") and otherwise comply with NEPA for the permitted action in light of the adverse effects of the Project on listed species. An EIS is required to analyze the Project's

proposed destruction of occupied vernal pool and ephemeral wetland habitat that is critically important to the survival and recovery of the listed species.

4.      Plaintiffs also challenge the United States Army Corps of Engineers and District Commander Colonel James Handura's (collectively, the "Corps") issuance of a Clean Water Act ("CWA") Section 404 permit ("404 Permit" or "Permit") for the Project in violation of the ESA, the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4332 *et seq.*, the CWA, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* The Corps failed to select the least environmentally damaging practicable alternative, as the CWA requires, by relying on the Applicant's narrow Project objectives to reject feasible development alternatives that would have reduced effects on listed species, and the Corps' failure to otherwise comply with the regulatory guidelines requiring the avoidance of adverse environmental impacts in permits allowing the filling of wetlands.

5.      Plaintiffs therefore seek (1) declaratory relief that the Service violated the ESA in preparing the 2020 Biological Opinion for the Stonegate Project; (2) declaratory relief that the Corps violated the ESA, NEPA, CWA, and the APA in issuing the 404 Permit, and approving the Memorandum of Record for the Permit; (3) injunctive relief directing the Service to set aside the Biological Opinion; (4) injunctive relief directing the Corps to set aside the 404 Permit and the Memorandum of Record; and (5) injunctive relief enjoining any implementation of the Stonegate Project pending completion of a legally adequate Biological Opinion and compliance with the ESA, NEPA, the CWA, and the APA.

## JURISDICTION AND VENUE

6.      This case arises under the Endangered Species Act, 16 U.S.C. §§ 1531-1544; the Clean Water Act, 33 U.S.C. §§ 1251 et seq., including § 1344(b) (application of Corps guidelines in permit determinations) and § 1344(c) (prohibition of discharge of dredged or fill material that will have an unacceptable adverse effect); the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; and the Administrative Procedure Act, 5 U.S.C. §§ 701-706. This court has jurisdiction over this action pursuant to 5 U.S.C. § 702 (review of agency action under the APA); 16 U.S.C. §§ 1540(c), (g) (actions arising under the ESA citizen suit provision); 28

U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. §§ 2201-02 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy). The court may grant the relief requested under the ESA, 16 U.S.C. § 1540(g), the APA, 5 U.S.C. §§ 701–706, and 28 U.S.C. § 2201-02 (declaratory and injunctive relief).

7.     By written notice to Defendants dated April 5, 2021, Plaintiffs provided notice of their intent to file suit more than sixty days prior to the filing of this complaint, as required by the ESA. 16 U.S.C. § 1540(g). Plaintiffs' notice letter demanded that the Service and the Corps satisfy their statutory obligations to complete ESA Section 7 consultation regarding the impacts to listed species from the Project, and to discontinue their reliance on the 2020 Biological Opinion. The Service and the Corps have failed to remedy the alleged violations, and therefore an actual, justiciable controversy exists within the meaning of 28 U.S.C. § 2201(a).

8.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Defendants have offices within the District, and Plaintiff AquAlliance has an office within the District.

## PARTIES

9.     Plaintiff AquAlliance is a California Public Benefit Corporation organized to protect waters in the northern Sacramento River's watershed to sustain family farms, communities, creeks and rivers, native flora and fauna, vernal pools and the sensitive species that rely on them, and recreation. AquAlliance has approximately 650 members who rely on Sacramento Valley groundwater for their livelihoods and live, recreate and work in and around waters of the State of California, including the Sacramento River, its tributaries, and the Sacramento-San Joaquin River Bay Delta. AquAlliance's mission is to defend northern California waters and to challenge threats to the hydrologic health of the Sacramento River watershed.

10.     AquAlliance and its members have long been engaged in efforts to protect listed species and their habitats, including vernal pools, in Butte County, and Chico specifically. These

4

efforts include an attempt to purchase the Stonegate property in 2001-2002 for permanent preservation; purchase of over 800 acres in Northern Chico specifically to protect vernal pool habitats, including areas with existing Butte County meadowfoam populations; participation in the Vernal Pool Recovery Plan Working Group; and participation in the Butte County and Chico General Plan update processes to specifically advocate for vernal pool preservation, among other activities. The executive director of AquAlliance has organized wetland fieldtrips, attended by academics and personnel from state and federal agencies, that visited vernal pool habitats in the Chico area from 2004-2018. Field trip attendees toured the Project area in 2010, 2014, and 2018. AquAlliance plans to resume these field trips once the health risks posed by the COVID-19 pandemic have lessened.

11.    AquAlliance organized and hosted the Vernal Pools Conference in 2010, 2014 and 2018. The Vernal Pools Conference brought together experts in the field of vernal pool ecology, conservation, and restoration for two days of panel discussions and speaker presentations followed by a day visiting vernal pool sites within Butte County. Field trip attendees toured the Project area, as well as other locations within Chico, in 2010, 2014, and 2018.

12.    AquAlliance's members frequent the Project area for the purposes of recreation, wildlife viewing, aesthetic enjoyment, and environmental education. AquAlliance has several members that own property within 2 miles of the Project site, and who regularly visit the Project area to observe and photograph the vernal pools and enjoy the surrounding viewshed, and plan to return in the near future to continue these activities. AquAlliance members utilize the Steve Harrison Memorial Bike Path, which runs along the Project's eastern boundary, and the walking path along the levee that bifurcates the Project site to observe, photograph, and enjoy the vernal pools and vernal pool wildflower displays.

13.    Many AquAlliance members have invested significant time, in both personal and professional capacities, to protect the vernal pool habitats in and around Chico. Their recreational, aesthetic, professional and scientific interests would be adversely affected by Project.

5

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a national conservation organization and California nonprofit corporation that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 87,000 members worldwide, including more than 100 members in Butte County. The Center has worked for decades to safeguard water and aquatic habitats for people, plants, and animals. One of the Center's main goals is to protect the habitats and ecological communities that may be adversely affected by human activity. The Center's members and staff value and benefit from rare species' continued existence in the wild and are harmed by development and associated trends like global climate change and water degradation that threaten wild species' survival and recovery. The Center has worked for years to protect California's vernal pools and vernal pool species.

15.     In bringing this lawsuit, Plaintiffs stand in the shoes of their members who live, work, and recreate in places that may be affected by the Project, and who use, visit, study, and cherish the land, wildlife, and other resources that may be irrevocably damaged by the Project. Plaintiffs have numerous members and other supporters who live in Butte County, and Chico—where the Project will be located. Plaintiffs' members, other supporters, and staff include individuals who study and advocate for better protection of wildlife and other resources threatened by the Project.

16.     For example, some of Plaintiffs' members own property near the Project site. The Project threatens these individuals' use and enjoyment of their property by removing valued open space and environmental amenities from the immediate vicinity of members' property. Some of Plaintiffs' members enjoy observing and photographing wildlife and natural landscapes while walking and biking along public paths and trails directly adjacent to the Project site, and plan to continue visiting the area to pursue such activities in the future. In addition, some of Plaintiffs' members study and enjoy observing wild species whose survival and recovery are threatened by the Project, including the endangered vernal pool tadpole shrimp and Butte County meadowfoam, and threatened vernal pool fairy shrimp and giant garter snake. Some of these members are naturalists, biologists, and birdwatchers who visit areas near the proposed Project

6

site to study and observe these species, and have plans to return to these areas in the future to
continue observing these species in their natural habitat.

17.     Plaintiffs' members derive scientific, recreational, spiritual, and aesthetic benefits
from imperiled species' existence in the wild. Their interest in maintaining the species inhabiting
vernal pools and associated upland habitat, seasonal wetlands and other habitats that may be
affected by Project activities is entirely dependent on the continued existence of healthy,
sustainable, and accessible ecosystems and populations. Any activities that "may affect" or
destroy, degrade, or diminish these areas, or that kill, injure, harm, harass, or displace
populations of listed species, interfere with Plaintiffs' members' use and enjoyment of the areas
and species.

18.     Plaintiffs' members include scientists who study various threatened and
endangered species, and whose interests in studying and enjoying these species and their habitats
are entirely dependent on the continued existence of such species. Any action that interferes with
and harms these species also harms those members' interests and enjoyment in studying those
species. Any loss of individuals or habitat from Project activities would hamper their ability to
undertake such research in the future, thereby harming their academic and aesthetic interests in
those species.

19.     Plaintiffs have also suffered procedural and informational injuries from
Defendants' violations. These injuries are connected to Plaintiffs' substantive recreational,
scientific, spiritual, and aesthetic interests. Plaintiffs' members and staff rely on Defendants to
comply with the requirements of the ESA, NEPA, and the CWA. Plaintiffs rely on these laws to
achieve their organizational purposes, including monitoring the impacts of agency actions on the
environment and listed species; monitoring legal compliance concerning environmental
management; educating and informing members, directors, staff, and the public about species
management and the state of the environment; and advocating for policies that protect habitats
and wildlife.

20.     Plaintiffs are also injured through impairment of their fundamental missions to
protect the environment and imperiled species, and diversion of resources from other critical

tasks that would not have been necessary absent Defendants' actions. Defendants' failure to comply with the ESA, NEPA, and the CWA has caused, and will continue to cause, Plaintiffs to divert and expend resources and staff—which would have instead been expended on other organizational conservation priorities—to learn about the effects of the Project on specific waterways, habitats, and species in which Plaintiffs and their members have vital interests.

21.     Plaintiffs are non-profit conservation organizations with limited resources that can be dedicated to their core mission to protect the environment, imperiled species, and the habitats they rely on. Defendants' actions impede Plaintiffs' ability to carry out their fundamental missions, and directly undercuts decades of successful work by Plaintiffs to enforce environmental laws that protect waterways and listed species.

22.     These are actual, concrete injuries to Plaintiffs, caused by Defendants' failure to comply with the ESA, NEPA, the CWA, and implementing regulations. The interests and organizational purposes of Plaintiffs and members are directly and irreparably injured by Defendants' violations of law as described in this Complaint. Unless this Court grants the requested relief, harm to the vernal pool and seasonal wetland habitat and protected species will continue to accrue, and the aesthetic, recreational, educational, professional, scientific, spiritual, and conservation interests of Plaintiffs and their staff and members will continue to be adversely affected. Absent the requested relief, the Project will push the listed species closer to extirpation, permanently and irrevocably affecting Plaintiffs' interest in the listed species.

23.     The relief Plaintiffs seek in this lawsuit will redress their injuries by requiring Defendants to comply with the ESA, NEPA, and the CWA. This relief will prevent Plaintiffs from being harmed by the Project and give Plaintiffs and their members more comprehensive and complete information about threats to waterways, protected species, and other valued resources. It will allow Plaintiffs, their members and supporters, and others who are concerned about the Project, to participate more effectively in permit processes and, at the very least, advocate more effectively for changes to mitigate the adverse impacts of the Project (including but not limited to measures designed to avoid impacts to aquatic resources and protect listed

species). The relief sought by Plaintiffs will help ensure that listed species will not be jeopardized by the Project, as the ESA requires.

24.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("the Service") is a federal agency within the United States Department of the Interior. The Service is required by law to protect and manage the fish, wildlife, and native plant resources of the United States, including through implementation and enforcement of the ESA. The Service is responsible for ensuring that the Corps' permitting decisions comply with the ESA, particularly regarding potential impacts to terrestrial wildlife species that have been listed as threatened or endangered with extinction pursuant to the ESA, including the vernal pool fairy shrimp, vernal pool tadpole shrimp, Butte County meadowfoam, and giant garter snake.

25.     Defendant DEB HAALAND is the Secretary of Interior, the federal official responsible for the Service's compliance with and enforcement of the ESA and its joint regulations. Defendant Secretary Haaland is sued in her official capacity.

26.     Defendant U.S. ARMY CORPS OF ENGINEERS is an agency of the United States and a subdivision of the U.S. Department of the Army, which is in the U.S. Department of Defense. The Corps is the action agency for the Project with regard to compliance with the ESA, the CWA, and NEPA.

27.     Defendant COLONEL JAMES HANDURA is District Commander for the Sacramento District of the U.S. Army Corps of Engineers. Defendant Col. Handura is responsible for ensuring that the Corps complies with the requirements of the ESA, CWA, NEPA and APA.

## STATUTORY AND REGULATORY BACKGROUND

### I.  THE ENDANGERED SPECIES ACT

28.     The ESA requires all federal agencies to utilize their authorities to carry out programs for the conservation of threatened and endangered species. 16 U.S.C. § 1536(a)(1).

29.     The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The ESA defines "threatened species" as "any species which is likely to become an endangered species

within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

30.    To fulfill the substantive purposes of the ESA, federal agencies are required to engage in Section 7 consultation with the Service (for terrestrial species) to "insure that any action authorized, funded, or carried out by" the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).

31.    Section 7 consultation is required for "any action [that] may affect listed species or critical habitat." 50 C.F.R. § 402.14. Agency "action" is defined broadly in the ESA's implementing regulations to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," such as the promulgation of regulations, the granting of permits, or actions directly or indirectly causing modifications to the land, water, or air. *Id*. § 402.02.

32.    The duties in ESA Section 7 are only fulfilled by an agency's satisfaction of the consultation requirements that are set forth in the implementing regulations for Section 7 of the ESA, 50 C.F.R. §§ 402.10-402.16, and only after the agency lawfully complies with these requirements may an action that "may affect" a protected species go forward.

33.    Each federal agency must review its actions at "the earliest possible time" to determine whether any action "may affect" listed species or their critical habitat in the "action area." *Id*. § 402.14(a). The "action area" encompasses all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id*. § 402.02. The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus the Section 7 consultation requirement is "easily triggered." Interagency Cooperation —Endangered Species Act of 1973, As Amended, 51 Fed. Reg. 19,926 (June 3, 1986).

34.    If an action agency concludes that the action is "likely to adversely affect" listed species or critical habitat, the agency must engage in "formal consultation" with the Service to meet the ESA's substantive "no jeopardy" mandate. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

If the action agency determines that the action is "not likely to adversely affect" listed species or critical habitat, and receives the Service's written concurrence with that determination, the agency need not initiate formal consultation. 50 C.F.R. § 402.14(b). However, if the agencies' determination or Service's concurrence is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA, the Service's concurrence is unlawful and must be set aside. *See* 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2).

35.    Formal ESA consultation commences with the action agency's written request for consultation and concludes with the Service's issuance of a "biological opinion." *Id*. § 402.14(g)(4). During formal consultation, the Service and the action agency must evaluate the "effects of the action," including all direct and indirect effects of the proposed action, plus the effects of actions that are interrelated or interdependent, added to all existing environmental conditions—that is, the "environmental baseline." 50 C.F.R. § 402.02. The environmental baseline includes the "past and present impacts of all Federal, State, or private actions and other human activities in the action area … ." The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

36.    The biological opinion states the Service's opinion as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id*. § 402.14(g)(4). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id*. § 402.02. The determination of whether an activity is likely to jeopardize the continued existence of a species must be based solely on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and the Service must use the best available science in formulating its biological opinion and approving incidental take through formal consultation. 50 C.F.R. § 402.14(g)(8).

37.     If the Service determines that the action is likely to jeopardize a species, the biological opinion must outline "reasonable and prudent alternatives" to the action, if any exist, that will avoid jeopardy and "which [the agency] believes would not violate [Section 7(a)(2)]." *Id*. § 1536(b)(3)(A); 50 C.F. R. §402.14(h)(3). The Service may also "suggest modifications" to the action during the course of consultation to "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13(b).

38.     Under Section 9 of the ESA, it is illegal to engage in any activity that results in the unauthorized "taking" an endangered species. 16 U.S.C. § 1538(a)(1)(B). The unauthorized taking of a threatened species may also be prohibited by regulation. 16 U.S.C. § 1533(d). The term "take" is defined in the statute to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(18).

39.     Pursuant to Section 7(b)(4) of the ESA, a biological opinion may include an Incidental Take Statement ("ITS"), which must specify the impact of any allowable takes of individual members of the species, provide reasonable and prudent measures ("RPMs") necessary to minimize the impact of those takes, and set forth terms and conditions that must be followed to implement such measures. 16 U.S.C. § 1536(b)(4); 50 C.F. R. § 402.14(i)(1), (3). An ITS may thus authorize the taking of endangered and threatened species that would otherwise be prohibited by Section 9 of the ESA.

40.     After the issuance of a biological opinion and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency and the Service must reinitiate formal consultation if, inter alia, "[t]he amount or extent of taking specified in the incidental take statement is exceeded; new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; the identified action is subsequently modified in a manner that causes an effect to the listed species ... that was not considered in the biological opinion; or a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16.

41.     Section 7(d) of the ESA provides that once a federal agency initiates or reinitiates consultation under the ESA, the agency, as well as any applicant for a federal permit, "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation. Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to listed species or adverse modification of critical habitat.

## II. THE NATIONAL ENVIRONMENTAL POLICY ACT

42.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

43.     In creating NEPA, Congress recognized that "each person should enjoy a healthful environment" and the statute therefore requires that the federal government use all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." *Id*. § 4331(b)–(c).

44.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "General statements about 'possible' effects and

13

'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

45.     NEPA seeks to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c). When the federal government acts before fulfilling its NEPA obligations, courts may set the action aside until the government complies with NEPA.

46.     The purpose of the NEPA process is to inform federal agency decision-makers and the public of the "reasonable alternatives" that would "avoid or minimize adverse impacts or enhance the quality of the human environment." *Id*. § 1502.1. This analysis of alternatives is the "heart" of NEPA. The agency should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." *Id*. § 1502.14.

47.     To accomplish this, NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—the environmental impact statement ("EIS")—must describe the environmental impacts of the proposed action. *Id*. § 4332(2)(C)(i), (ii). The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1.

48.     To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency may first prepare an environmental assessment ("EA"). *Id*. § 1501.5.

49.     In the EA, the lead agency must take a hard look at the relevant environmental concerns and alternatives to the proposed action, and must consider short and long-term effects, both beneficial and adverse effects, effects on public health and safety, and effects that would violate Federal, State, Tribal, or local law protecting the environment. 40 C.F.R. § 1501.3.

50.     If the agency determines, after preparing the EA, that the proposed action does not require preparation of an EIS, it must then prepare a finding of no significant impact ("FONSI") detailing why the action "will not have a significant effect on the human environment." 40 C.F.R. § 1501.6; *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (describing procedure). If the EA indicates that the federal action "may" significantly affect the quality of the human environment, the agency must prepare an EIS. *See, e.g.*, *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004).

51.     In making the determination of whether to prepare an EIS, the agency must "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 97 (1983). "A determination that significant effects on the human environment will in fact occur is not essential. If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric*., 681 F.2d 1172, 1178 (9th Cir. 1982) (internal citation omitted).

52.     The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President. 42 U.S.C. § 4342. CEQ has promulgated general regulations implementing NEPA. 40 C.F.R. §§ 1500-1508. CEQ amended its NEPA regulations in 2020 with an effective date of September 14, 2020; however, because the Project was reviewed prior to those amendments, the Corps' actions here are subject to the NEPA regulations adopted in 1978 (and subject to a narrow amendment removing the requirement for a worst-case analysis in 1986).

53.     NEPA requires an analysis of the indirect and cumulative effects of an activity, which are critical components of environmental impacts and in many cases are the most important issues of concern to the public and other stakeholders. *See* 42 U.S.C. § 4332(2)(C) (requiring an evaluation of "*any adverse environmental effects* which cannot be avoided should the proposal be implemented," which must examine "the environmental impact of the proposed action" "to the fullest extent possible") (emphasis added); 42 U.S.C. § 4332(2)(F) (requiring agencies to consider the "worldwide and long-range character of environmental problems");

*Kleppe v. Sierra Club*, 427 U.S. 390, 409-10 (1976) (noting that Congress's mandate that agencies use "all practicable means" to "assure consideration of the environmental impact of their actions in decisionmaking," requires consideration of cumulative effects) (citations omitted); *City of Davis v. Coleman*, 521 F.2d 661, 676–77 (9th Cir. 1975) (outlining the statutory obligation to consider the indirect effects of agency actions).

54.     "A meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable— that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

55.     Cumulative impact analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects but have no quantified assessment of their combined impacts. *Bark v. United States Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020).

56.     NEPA requires federal agencies to analyze both the probability of a given harm occurring and the consequences of that harm if it does occur. *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012). Agencies cannot avoid their responsibility to consider future effects by claiming they are uncertain, because NEPA requires some element of predictive behavior. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078-79 (9th Cir. 2011).

57.     The Corps' regulations explain that the scope of a NEPA analysis includes the impacts of the specific activity requiring a Corps permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review. 33 C.F.R. Pt. 325, App. B(7)(b)(1). The Corps' regulations provide that the NEPA analysis should include direct, indirect, and cumulative impacts. *Id*. App. B(7)(b)(3).

58.     The CEQ regulations require federal agencies to provide an opportunity for public participation. *See* 40 C.F.R. § 1506.6 (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of … the availability of environmental documents so as to inform those persons … who may be interested or affected," and "[s]olicit appropriate information from the public").

**III. THE CLEAN WATER ACT**

59.     The objective of the Clean Water Act is to restore and maintain the physical, chemical, and biological integrity of the nation's waters. 33 U.S.C. §1251(a). The Clean Water Act and its implementing regulations define "waters of the United States" to include wetlands adjacent to waters of the United States. *Id*., § 1362(7); 33 C.F.R. § 328.3(b).[1]

60.     Subject to certain exemptions, Section 404 of the Clean Water Act prohibits the discharge of dredged or fill material into waters of the United States without a permit from the Corps. 33 U.S.C. § 1344. The term "fill material" is defined in the Corps' regulations as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a water body." 33 C.F.R. § 323.2(m). The regulations define the "discharge of fill material" as including the "[p]lacement of fill that is necessary to the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; [and] site-development fills." *Id*. § 323.2(n).

61.     The Corps' Section 404 regulations prohibit the issuance of a Section 404 permit if "the district engineer determines that it would be contrary to the public interest." *Id*. § 320.4(a). This "public interest review" requires the Corps to weigh the benefits of the permitted activity against its reasonably foreseeable detriments, considering all relevant factors and their cumulative impacts. *Id*. § 320.4(a); *see also id*. § 320.4(b)(4). These factors include general environmental concerns, wetlands, fish and wildlife values, water supply and conservation, water quality, and the general needs and welfare of the people. *Id*. § 320.4(a).

---

[1] The current regulations defining "waters of the United States" have an effective date of June 22, 2021. However, the Biden Administration has requested remand of this rule, and the Corps evaluated the Project under the prior version of the regulations.

62.     As part of its public interest analysis, the Corps must also evaluate the mitigation measures taken to "avoid[], minimiz[e], rectify[], reduc[e], or compensate[e] for" the negative impacts of the permitted activity on wetlands and the waters of the United States.  *Id*. § 320.4(r).

63.     The Environmental Protection Agency ("EPA"), in conjunction with the Secretary of the Army, is responsible for promulgating regulations that provide guidance for the issuance of permits under CWA Section 404. 33 U.S.C. § 1344(b)(1). These are known as the "404(b)(1) Guidelines" and are codified at 40 C.F.R. part 230.

64.     The 404(b)(1) Guidelines require, among other things, the Corps to complete a "least environmentally damaging practicable alternative" or LEDPA analysis to determine if there is a "practicable alternative" to the proposed discharge that would have a less adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a). No discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. *Id*. An alternative is considered practicable if "it is available and capable of being done after taking into consideration cost, existing technology and logistics in light of overall project purposes." *Id*. § 230.10(a)(2).

65.     "In evaluating whether a given alternative site is practicable, the Corps may consider such facts as cost to the applicant and logistics. In addition, the Corps has a duty to consider the applicant's purpose." *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989). However, an applicant's purpose must be "legitimate," and alternatives considered by the Corps "do[] not have to accommodate components of a project that are merely incidental to the applicant's basic purpose." *Id*.

66.     Where the permitted action involves a "special aquatic site" — which includes wetlands — but is not "water dependent," it is presumed that practicable alternative sites that do not involve special aquatic sites are available, unless clearly demonstrated otherwise. 40 C.F.R. § 230.10(b)(3). In addition, all practicable alternatives that do not involve special aquatic sites are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise. *Id*.

67.     The 404(b)(1) Guidelines specifically prohibit the Corps from permitting a discharge that would jeopardize the continued existence of an endangered or threatened species, or results in the destruction or adverse modification of designated critical habitat. 40 C.F.R. § 230.10(b)(3).

68.     The 404(b)(1) Guidelines also prohibit the Corps from permitting a discharge that "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). Effects contributing to significant degradation include "[s]ignificantly adverse effects … on life stages of aquatic life and other wildlife dependent on aquatic ecosystems …" and "[s]ignificantly adverse effects … on aquatic ecosystem diversity, productivity, and stability," including loss of wildlife habitat. 40 C.F.R. § 230.10(c)(2)-(3).

69.     The 404(b)(1) Guidelines also require that the Corps not issue a permit for any discharge of fill material "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d).

70.     The Corps may only issue an individual Section 404 permit if it determines the discharge complies with all applicable provisions of the 404(b)(1) Guidelines, "including those which require the permit applicant to take all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States." 33 C.F.R. § 332.1(c)(2). Compensatory mitigation for *unavoidable* impacts may be required to ensure that an activity requiring a Section 404 permit complies with the 404(b)(1) Guidelines. *Id.*

## IV.  THE ADMINISTRATIVE PROCEDURE ACT

71.     Pursuant to the Administrative Procedure Act ("APA"), a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency actions for which there is no adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

72.     The APA provides for judicial review of agency actions such as those at issue here and provides the standard of review for ESA citizen suit claims. A reviewing court shall

"hold unlawful and set aside" any agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C. § 706(2)(A)) or "without observance of procedure required by law" (5 U.S.C. § 706(2)(D)).

## **FACTUAL ALLEGATIONS**

I.   The Stonegate Project

73.   The Stonegate Project is proposed on a 314-acre site located on both the east and west of Bruce Road and north of the Skyway in southern Chico, Butte County, California. The mixed-use development project would include 423 single-family residential lots, 13.4 acres of multi-family residential land uses, 36.6 acres of commercial land uses, 5.4 acres of storm water facilities, 3.5 acres of park, and a 137-acre open space preserve.

74.   The biological communities on the Project site are dominated by annual grassland, with a row of valley oak occurring along a drainage located on the eastern portion of the site. Vernal pool and vernal swale complexes—pools that form during the rainy season and dry out during the summer and fall months—are spread throughout the annual grassland landscape. These aquatic features are known to support ESA-listed species, including the endangered Butte County meadowfoam, the threatened vernal pool fairy shrimp, and the endangered vernal pool tadpole shrimp.

75.   The Project would permanently destroy 9.14 acres of wetlands, 45% of the total 20.19 acres of jurisdictional waters on the Project site. The impacted areas include 5.92 acres of seasonal wetlands and 2.85 acres of vernal pools, among other aquatic features.

76.   Ephemeral wetland habitats, including the vernal pools on the Project site, support immense biological diversity. Numerous plant and animal species are specially adapted to the seasonal availability of water, characteristic of California's Mediterranean climate.

77.   Because of the seasonal nature of vernal pools and the unique evolutionary histories of the species that depend on such habitats, the risk of genetic isolation due to habitat fragmentation is high. The genetic profile of a species in a single vernal pool can vary from that of a nearby vernal pool, meaning that connectivity between the two pools is critical to support the sharing of genetic information so that the species is less susceptible to local extirpation

events. The quality and amount of upland habitat surrounding vernal pools and other ephemeral aquatic habitats is a key factor in the survival of vernal pool species by supporting hydrologic function, providing connectivity pathways for pollinators and facilitating genetic flow among adjacent aquatic features. *See* 59 Fed. Reg. 48,137.

78.     Overall, California has lost approximately 80%-90% of wetland acreage that was present in the late 18th century. Only 10% of historic vernal pool habitat is still viable in California, and what remains is threatened by urban sprawl development, agricultural expansion, and climate change.

II.   The Project's Procedural History

A.   The Corps' Issuance of the Project's 404 Permit

79.     The Corps issued a public notice for the Project on March 10, 2017, followed by a revised public notice on September 7, 2018. A total of 41 public comments were received in response to the two public notices.

80.     Plaintiff AquAlliance submitted comments in response to both notices, on April 10, 2017 and October 9, 2018. AquAlliance's comments raised concerns about the Project's impacts on vernal pool habitat onsite, with particular emphasis on impacts to Butte County meadowfoam, vernal pool fairy shrimp and vernal pool tadpole shrimp. AquAlliance also raised concerns that the proposed mitigation—an onsite wetland preserve—would actually be two small preserves separated by the diversion channel, which would make them more susceptible to edge effects and thus decrease their conservation value and habitat functionality. The AquAlliance letters requested a public hearing on the Project, advised the Corps that it must prepare an EIS that includes an adequate list of reasonable alternatives in order to comply with NEPA, and requested notification once the NEPA process had been completed. AquAlliance requested that the Corps' alternatives analysis include an alternative the limited Project development only to the parcel west of Bruce Road.

81.     Members of the public, joined by AquAlliance, voiced concerns about Project impacts to vernal pool species and the inadequacy of the proposed mitigation. Specifically, comments highlighted the lack of any available Butte County meadowfoam mitigation credits at

regional mitigation banks. The lack of available credits undermines the effectiveness of the
proposed mitigation, which states that mitigation credits can be purchased should the onsite seed
collection and reestablishment in the preserve area fail to create additional meadowfoam
populations. Regarding mitigation for vernal pool and other seasonal wetlands impacted by the
Project, public comments highlighted the challenges of creating these unique habitat types, and
that the Corps should prioritize the preservation of existing, functional vernal pool habitat instead
of relying on the purchase of mitigation credits based on creation efforts away from the Project
site.

82.     On March 13, 2017, the Service submitted comments regarding the Project to the
City of Chico and copied the letter to the Corps. The Service stated that comments originally
made in a November 24, 2015, letter concerning a previous iteration of the Project remain
unchanged. The Service expressed its position that, among other issues, even partial
development of the property could preclude recovery of listed species that rely on the vernal
pools on the Project site because they would be "significantly and adversely impacted by edge
effects of the proposed development." Memorandum of Record at 15.

83.     On May 5, 2017, the California Department of Fish and Wildlife ("CDFW")
submitted comments in response to the public notice for the Project. CDFW acknowledged the
Project's potential to significantly impact state-listed species, such as Butte County
meadowfoam, and that an Incidental Take Permit may be required. CDFW also noted the
meadowfoam on the Project site is genetically distinct from existing populations north and south
of Chico, and that inbreeding and further population reductions could result from the loss of
meadowfoam on the Project site. CDFW concluded that the Project as proposed would result in
significant impacts to the environment and recommended the preparation of an Environmental
Impact Statement.

84.     The EPA also provided comments on the Project, on April 6, 2017. In its
comments the EPA expressed concerns about the Project's impacts to vernal pool habitat onsite,
which the EPA considers Aquatic Resources of National Importance ("ARNI"). The EPA
expressed its objection to the development of the Project site east of Bruce Road because of the

vernal pool habitat and Butte County meadowfoam present. The EPA also commented that the Project's proposed conservation measures were inadequate, and that the Project, as proposed in the 2017 public notice, does not represent the least environmentally damaging practicable alternative, or LEDPA. The EPA specifically requested that an alternative that limited Project development to the parcel west of Bruce Road be included in the Corps' alternatives analysis.

85.     In response to the Corps' issuance of the public notice for the Project, multiple members of the public, including government agencies, submitted comments requesting an analysis of Project alternatives to be conducted and made public, in order to comply with the 404(b)(1) Guidelines. Commenters also requested a public hearing on the Project, but the Corps declined to hold such a hearing, as it concluded such a meeting would be unlikely to product additional information to inform the Corps' decision.

86.     On August 5, 2020, the Corps issued its Memorandum for Record for the Project, which constitutes the "Environmental Assessment, 404(b)(1) Guidelines Evaluation, as applicable, Public Interest Review, and Statement of findings for the subject application."

87.     The Memorandum of Record provided summaries of the public comments received in response to the public notices, and acknowledged the multiple requests for an alternatives analysis. The Memorandum for Record contained a discussion of onsite and offsite alternatives based on information provided by the applicant on October 31, 2018.

88.     The Corps' alternatives analysis discussed the onsite and offsite alternatives and the degree to which they lessened environmental impacts while still achieving the Project objectives. The overall project purpose, as determined by the Corps is "to construct a medium-scale mixed-use development in northwest Butte County, California."

89.     The Memorandum for Record discussed three offsite alternatives, all of which failed to meet Project objectives as defined by the Corps, which required a property at least 200 acres in size, within the City of Chico's sphere of influence, not subject to a conservation easement or designated as open space, and not within a special planning area or otherwise approved for development already.

90.     The Memorandum for Record assessed six onsite alternatives against screening criteria that required an alternative to achieve, inter alia, the overall project purpose, a development cost that is not unreasonably expensive, significantly fewer impacts to the aquatic environment, and avoidance of additional significant environmental consequences. After finding two of the options not practicable, three alternatives to be practicable but inappropriate due to insufficient reduction of aquatic impacts or additional adverse effects, the Corps concluded that only Alternative 5 and the proposed Project were practicable. Alternative 5 would reduce the number of housing units by 10% and impacts to jurisdictional waters by 7%, compared to the proposed Project. Both Alternative 5 and the proposed Project include significant development within the parcel east of Bruce Road.

91.     In response to EPA and other commenters' request for analysis of an alternative that would only develop the parcel west of Bruce Road, the Corps claimed that such an alternative would not meet the Project objectives. Namely, development limited to the parcel west of Bruce Road would not meet the Applicant's plan to subdivide the project into residential, commercial, open space and park uses. The Corps argued the west of Bruce Road alternative would also fail to meet the objective to "provide a significant number of single family and multi-family residential units" to address Chico's housing needs. The Corps further justified exclusion of the requested alternative because it would not reduce impacts to meadowfoam by a significant margin. *See* Memorandum of Record, Responses to 2018 Public Notice Comments at 4.

92.     Limiting development to the parcel west of Bruce Road would reduce impacts to meadowfoam by 0.10 acres, a 9% decrease compared to the approved Project. The west of Bruce Road alternative would also reduce impacts to vernal pool fairy shrimp and vernal pool tadpole shrimp occupied habitat by 77% compared to the approved Project, reducing impacts from 8.77 acres to 2.01 acres.

93.     Alternative 5, which the Memorandum for Record noted was the Applicant's preferred alternative, reduced development by 28 acres compared to the proposed Project, reducing impacts to jurisdictional waters by 0.69 acres (9.14 acres compared to 9.83 acres as originally proposed). The Corps concluded that Alternative 5 was the LEDPA under the

404(b)(1) Guidelines, and Alternative 5 is the version of the Project the Corps ultimately approved.

B.  The Service's Biological Opinion for the Project

94.     Because the Project is likely to adversely affect listed species, the Corps requested the initiation of formal consultation with the Service on the Project on July 17, 2018. The Service issued the Biological Opinion for the Project on March 4, 2019. An amended Biological Opinion was issued December 18, 2019, which addressed revisions to the on-site preserve boundary that excluded the Butte Creek Diversion Channel from the on-site preserve. A second amended Biological Opinion (BO, 08ESMF00-2016-F-0236-3) was issued on January 23, 2020, to address typographic errors.

95.     The Biological Opinion acknowledged the Project would remove existing habitats for, and populations of, listed species, resulting in significant adverse effects to the species. Ultimately, though it acknowledges that listed species will be harmed, the Biological Opinion concluded that the Project would not jeopardize the continued survival and recovery of the listed fairy shrimp, tadpole shrimp, and meadowfoam. The Biological Opinion did not analyze impacts to the ESA-listed giant garter snake, even though it is known to inhabit the Project area.

96.     The Service's determination in the Biological Opinion was premised on several assumptions about the status of the affected species. For example, the Biological Opinion found no change in the status of any of the listed species since status reviews in 2007 for the vernal pool shrimp species and 2008 for meadowfoam. The Biological Opinion did note that vernal pool habitat in the Northeastern Sacramento Valley Vernal Pool Region continues to decline due to urbanization, poorly managed grazing, altered hydrology, and edge effects from surrounding land uses, among other threats.

97.     The Biological Opinion provided a combined assessment of the population status of, and potential Project effects on, the vernal pool fairy shrimp and vernal pool tadpole shrimp. The Biological Opinion acknowledged the different listing categories of each species, but did not differentiate between the two species in terms of its jeopardy finding or required conservation measures.

98.     The Biological Opinion includes an "Incidental Take Statement" for fairy shrimp and tadpole shrimp. The Service anticipated "incidental take" of 8.79 acres of habitat that will be lost due to development and operation of the Project.

99.     The Biological Opinion did not contain an "Incidental Take Statement" for meadowfoam, since the ESA does not require the Service to take such action for listed plant species. However, the Project is required to obtain incidental take coverage under the California Endangered Species Act for impacts to meadowfoam. The California Department of Fish and Wildlife issued an Incidental Take Permit for the Project which covers impacts to only 0.10 acre of occupied meadowfoam habitat.

100.     The Service included a "reasonable and prudent measure" along with the Incidental Take Statement. The reasonable and prudent measure adopts and requires the implementation of the conservation measures set forth in the Corps' biological assessment, and other measures that were included in two letters received by the Service in 2019 and 2020, for the Project.

101.     The proposed mitigation includes the purchase of 15.48 acres of credits from a mitigation bank in the region as well as development of a 132-acre on-site preserve. This preserve includes 2.10 acres of suitable vernal pool habitat for the fairy shrimp and the tadpole shrimp, and 4.00 acres of occupied meadowfoam habitat. Additionally, the Applicant will collect seeds from impacted meadowfoam populations and attempt to reestablish 1.35 acres of meadowfoam within the onsite preserve. If the seed collecting and planting is unsuccessful, the Applicant has the option of purchasing meadowfoam credits from a conservation bank, purchasing property with occupied meadowfoam habitat, or participating in the Butte Regional Conservation Plan.

102.     It is not clear that the necessary mitigation credits are available at Service-approved mitigation banks in the region, for both the vernal pool shrimp species and meadowfoam. The Biological Opinion also fails to provide evidence that vernal pool creation at an offsite location will adequately replace the loss of established vernal pool habitat on the Project site. In the biological opinion for the neighboring Meriam Park project, discussed below,

26

1  the Service noted that "long-term success of created vernal pools has yet to be determined, and in

2  some cases, created vernal pools do not support federally-listed vernal pool crustacean

3  species[.]" and that "the proposed creation/restoration of vernal pool habitat within the onsite

4  preserve could result in indirect effects."

5    C.  Development History in Project Vicinity

6     103. The Service has issued previous biological opinions for development proposals

7  that affected vernal pool species in the immediate vicinity of the Project site.

8     104. In 2002, the Service issued a draft biological opinion that found the Eastgate

9  project, which sought a permit to fill 1.59 acres of vernal pool habitat, would jeopardize the

10 continued survival of Butte County meadowfoam. The Eastgate project site is approximately 1

11 mile north of the Project site. The Eastgate draft biological opinion was referenced in the Corps'

12 analysis of potential alternatives for the Project.

13    105. In 2007, the Service issued a biological opinion for the Meriam Park project

14 which concluded the loss of 0.46 acres of occupied meadowfoam habitat would not jeopardize

15 the continued survival of the species. The Meriam Park project committed to preserving 8.74

16 acres of existing meadowfoam habitat to offset the loss of 0.46 acres, a mitigation ratio of 19:1.

17   III. <u>The Vernal Pool Fairy Shrimp</u>

18    106. The vernal pool fairy shrimp (*Branchinecta lynchi*) (hereinafter "fairy shrimp") is

19 an aquatic crustacean endemic to vernal pool and ephemeral freshwater habitat in California's

20 central valley and coast ranges, in addition to small areas within the Agate Desert of southern

21 Oregon. Fairy shrimp can occur in vernal pools and vernal pool-like aquatic features of variable

22 size and water quality, and are well adapted to, and completely dependent on, the ephemeral

23 habitats they occupy.

24    107. In 1994, the Service listed the fairy shrimp as threatened under the ESA. 59 Fed.

25 Reg. 48,136.

26    108. Critical habitat was designated for both vernal pool fairy shrimp and vernal pool

27 tadpole shrimp in 2003. The designated habitat was reduced by the Service through multiple

28 revisions for economic reasons, the last of which occurred in 2007.

109.    In 2006 the Service released the Recovery Plan for Vernal Pool Ecosystems of California and Southern Oregon ("Recovery Plan") that covered both the fairy shrimp and tadpole shrimp.

110.    The Recovery Plan identified core areas to be the initial focus of protection measures, because core areas represent the "specific sites that are necessary to recover these endangered or threatened species or to conserve the species of concern addressed in this recovery plan." Core areas are ranked as zones 1-3 in order of overall priority for recovery, with 1 being the highest priority.

111.    The Project site is within the Doe Mill Core Area, which is ranked zone 1. The Recovery Plan recommends that 85% of fairy shrimp habitat that existed in 2005 be preserved.

112.    The Project site contains 11.07 acres of suitable fairy shrimp habitat. The Project would permanently destroy 8.77 acres of fairy shrimp habitat. The Project's onsite preservation of approximately 20% of existing fairy shrimp habitat is a fraction of what the Recovery Plan states is needed to facilitate the recovery of the fairy shrimp.

113.    As part of the Project, the applicant has agreed to purchase 15.48 acres total of fairy shrimp and tadpole shrimp mitigation credits from Service-approved mitigation to help offset the Project's impacts to vernal pool habitat.

IV. The Vernal Pool Tadpole Shrimp

114.    The vernal pool tadpole shrimp (*Lepidurus packardi*) (hereinafter "tadpole shrimp") is an aquatic crustacean endemic to vernal pool and other ephemeral freshwater habitat in California's Central Valley and San Francisco Bay Area. The tadpole shrimp shares many of the life history traits of the fairy shrimp, described above, as well as other vernal pool brachiopods. Tadpole shrimp differ from fairy shrimp in that their distribution is more limited, being found only in vernal pool habitat in the Central Valley and isolated locations in around the San Francisco Bay Area.

115.    In 1994, the Service listed the tadpole shrimp as endangered under the ESA. 59 Fed. Reg. 48,136.

116.   Critical habitat was designated for both vernal pool fairy shrimp and vernal pool tadpole shrimp in 2003, before multiple revisions for economic exclusions, the last of which occurred in 2007. 72 Fed. Reg. 30,269.

117.   In 2006 the Service released the Recovery Plan that covered both the fairy shrimp and tadpole shrimp.

118.   The Recovery Plan gives a Zone 1 ranking to the tadpole shrimp, which recommends that 95% of habitat that existed in 2005 be preserved.

119.   The Recovery Plan lists the Doe Mill core area for tadpole shrimp as zone 1, the highest priority.

120.   The Project site contains 11.07 acres of suitable tadpole shrimp habitat. The Project would permanently destroy 8.77 acres of tadpole shrimp habitat. As with the fairy shrimp, the Project's preservation of 20% of existing tadpole shrimp habitat is not close to the Recovery Plan's 95% recommendation.

V.  The Butte County Meadowfoam

121.   Butte County meadowfoam (*Limnanthes floccosa ssp. californica*) is an herbaceous annual found only in vernal pool habitat in Butte County, California. Meadowfoam germinates in late fall, once the rainy season has begun, and flowers are produced in March and April, depending on conditions, before the die back in May.

122.   Studies have shown meadowfoam to demonstrate relatively low average genetic diversity within and among individuals in all existing populations in Butte County. Because small, isolated populations with low genetic diversity are a greater risk of extirpation, the Service itself has stated that the preservation of existing meadowfoam habitat should be prioritized when considering meadowfoam recovery. The meadowfoam populations surrounding the City of Chico are genetically distinct from populations further to the north and south of the city.

123.   Butte County meadowfoam was listed as endangered in 1982 under the California Endangered Species Act ("CESA"), and in 1992 under the ESA. 57 Fed. Reg. 24,192. The Project site was included in the 2002 draft critical habitat designation for meadowfoam, but was excluded from the final designation for economic reasons. 70 Fed. Reg. 11,140.

124.    The Service's 2006 Recovery Plan, which includes meadowfoam along with the vernal pool shrimp species, includes the Project site within the Zone 1 core habitat, which reflects the highest priority areas for meadowfoam survival and recovery.

125.    The Recovery Plan recognized that habitat areas not included in the critical habitat designation for a species may, nonetheless, be necessary for the recovery of the species. The Recovery Plan acknowledged that such lands, within Zone 1 and Zone 2 core areas, were excluded from meadowfoam critical habitat for economic reasons, but that some of those habitats outside critical habitat would be necessary for meadowfoam recovery.

126.    There are only 21 known populations of meadowfoam within Butte County, 7 of which are present within the Doe Mill core recovery area, in which the Project site is located.

127.    With respect to Meadowfoam, the Vernal Pool Recovery Plan stated that the goal of the "recovery criteria" is to "protect 100 percent of all occurrences of the species and to protect 95 percent of suitable habitat rangewide within the four core areas." The Plan further states that "[c]urrently, portions of nine of the 20 natural occurrences are protected. Therefore, this recovery criterion has not been met. In addition to habitat preservation, other criteria discussed within the Recovery Plan have not been met, and in some instances, not initiated. These include research, monitoring, management, and participation and outreach." (Limnanthes floccosa ssp. californica 5-Year Review: Summary and Evaluation, 2008. p. 20)

128.    Since its listing under the ESA, meadowfoam has continued to decline, with remaining populations threatened by development, inappropriate grazing, and alteration of surface and subsurface hydrologic conditions.

129.    A 2011 study (Sloop et al) of Butte County meadowfoam found the remaining populations exhibited low genetic diversity and were geographically isolated, rendering them increasingly vulnerable to on and off-site impacts, such as those stemming from land use changes. The susceptibility to inbreeding depression, driven by declining pollinator presence because of habitat fragmentation, makes meadowfoam particularly vulnerable to chance extirpation due to "sudden environmental changes such as global climate change." The 2011 study stated that because of the continued threats to Butte County vernal pool landscapes, and the

1  vulnerabilities of the existing meadowfoam populations demonstrated by the study, all existing

2  populations must be prioritized for conservation. If attempts to establish new meadowfoam

3  populations via the collection and transfer of seeds from existing meadowfoam populations, the

4  study urged extreme caution and strict regulation. The study noted that any attempts to transfer

5  seeds from an extant population to newly created vernal pools, or to supplement another

6  population, should only be carried out after exhaustive testing of the receiving population and

7  site to prevent negative impacts on the receiving site.

8       130.    The Project would result in the destruction of 1.13 acres of occupied

9  meadowfoam habitat, which represents 20% of the meadowfoam present in the Project action

10  area. Moreover, the Project will destroy one of only 7 remaining distinct populations of

11  meadowfoam within the Doe Mill core area.

12       131.    The applicant has proposed mitigating impacts to meadowfoam by preserving

13  4.00 acres of occupied meadowfoam habitat within the onsite Preserve, and the onsite

14  establishment of 1.35 acres of occupied meadowfoam habitat or the purchase of offsite

15  mitigation credits or property. The onsite preservation would amount to less than a 4:1 ratio

16  considering the 1.13 acres of occupied habitat that would be destroyed.

17       132.    The Environmental Impact Report ("EIR") prepared by the City of Chico for the

18  Project only analyzed permanent impacts to 0.23 acres of meadowfoam. To mitigate these

19  impacts, the EIR required a mitigation ratio of 19:1, such that 4.38 acres would be protected by

20  the onsite preserve. The 19:1 mitigation ratio is derived from the Recovery Plan's target of

21  preserving 95% of existing meadowfoam habitat.

22       133.    The Service has routinely required a 19:1 mitigation ratio for Project's that impact

23  meadowfoam in the same region as this Project. Previous actions where a 19:1 mitigation ratio

24  was required include the widening of highway 32 in Chico, and the 2003 Biological Opinion for

25  the proposed Canyon View High School adjacent to the Project site. The Service's Biological

26  Opinion for the Project required 4:1 onsite preservation to account for permanent impacts to 1.13

27  acres of occupied meadowfoam habitat, not the 19:1 ratio sought by the Recovery Plan and

28

consistent with past Service opinions. The Service did not provide an explanation for its

departure from its prior practice regarding meadowfoam mitigation ratio requirements.

VI. <u>The Giant Garter Snake</u>

134.    The giant garter snake (*Thamnophis gigas*, or "GGS") is an endemic species to

Central Valley California wetlands. The GGS, as its name suggests, is the largest of all garter

snake species—not to mention one of North America's largest native snakes—reaching a length

of up to 64 inches.

135.    The GGS was listed as federally threatened on October 20, 1993. 58 Fed. Reg.

54,053. Less than 5% of historic GGS wetland habitat remains in the Central Valley of

California. GGS now inhabits fragmented wetlands, marshes, ponds small lakes, low-gradient

streams with silt substrates, and managed waterways. Although GGS is predominantly an aquatic

species, it utilizes upland habitat during spring and summer periods, and has been found seeking

refuge in burrows as far as 50 meters from the edge of aquatic habitat.

136.    Studies have shown that average movement distances for GGS range vary, but are

usually less than 1 mile in a day. However, in response to droughts and other changes in water

availability, the GGS has been known to travel up to 5 miles in only a few days.

137.    The Butte Basin population of GGS is one of 9 extant populations observed in

2016. This population is in the vicinity of the Project. In fact, GGS has been observed in

Deadhorse slough approximately 1 mile north of the Project site.

138.    In 2007, the Service reviewed a development project adjacent to the Project site.

That development was required to mitigate for potential impacts to GGS after the Service

concluded that the project was likely to adversely affect the species, as well as vernal pool fairy

shrimp, vernal pool tadpole shrimp, and Butte County Meadowfoam. However, the Corps did not

analyze the impacts of the Project on GGS, and the Service ignored the species in the Biological

Opinion, with no explanation as to why the species would not be affected by the loss of habitat

attributable to the Project.

## FIRST CLAIM FOR RELIEF

**Violation of the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706, by Defendant Fish and Wildlife Service**

139.    Plaintiffs hereby incorporate by reference each and every allegation set forth in this Complaint as if set forth in full herein.

140.    Under the ESA, if a biological opinion does not provide an adequate basis for the Service's determination based on the best available science, if the Service's opinion fails to fully consider the impacts to listed species from a proposed action, or is otherwise arbitrary, capricious or unlawful, the opinion must be set aside. *See* 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2). Here, the Service's Biological Opinion was arbitrary and capricious in several respects.

141.    With regard to meadowfoam, the Service required an inadequate preservation ratio for mitigation of impacts to the species from construction of the Project. In other, similar situations, the Service has required a ratio of 19:1 to ensure that meadowfoam will not be jeopardized by development activities. Here, however, without any explanation, the Service required mitigation at a ratio of only 4:1. Since the Service itself has indicated that a ratio of at least 19:1 is necessary to ensure the continued existence and recovery of this listed species, it was arbitrary and capricious for the Service to only require 4:1 mitigation for this Project.

142.    The Service likewise ignored its own previous findings that destruction of a similarly sized meadowfoam population in close proximity to the Project site would jeopardize the continued survival of the species. Given that determination for the Eastgate project—and previous findings by the Service regarding the value of the Project site to meadowfoam recovery—there is no basis for allowing nearly the same amount of loss from the proposed Stonegate Project. The Service's "no jeopardy" determination regarding meadowfoam was therefore arbitrary and capricious, in violation of the ESA.

143.    With regard to the fairy shrimp and tadpole shrimp, the Service failed to ensure that the Project will not jeopardize the continued existence of these imperiled species, as the ESA requires, because it allows for a level of vernal pool loss that is completely contradictory to the Service's recovery plan for the species. Even though the Service has explicitly stated that 85% and 95%, respectively, of the remaining habitat for these species must be preserved to ensure

their continued existence, it has nonetheless allowed the destruction of 80% of the vernal pool habitat on the Project site. And while mitigation was required, there is no assurance that created wetlands can provide viable habitat for these species, or otherwise replace the functions and values of the habitat that will be bulldozed for this Project. The Service therefore failed to adequately analyze or consider the effects of the Project on the survival and recovery of the vernal pool fairy shrimp and vernal pool tadpole shrimp.

144. The Service also failed to ensure that the Project will not jeopardize the continued existence of fairy shrimp, tadpole shrimp, and meadowfoam, as the ESA requires, 16 U.S.C. § 1536(a)(2), because it relied on erroneous assumptions regarding the environmental baseline for these species—a fundamental pillar of the Service's jeopardy analysis. See 50 C.F.R. § 402.14(g)(2) and (4) (requiring the Service to "evaluate the current environmental baseline" and to "add the effects of the action" to that baseline in order to "formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species").

145. For the meadowfoam, the Service concluded, without any scientific support, that the environmental baseline had not changed since the previous status review for the species in 2008 due to efforts to protect a portion of the remaining populations, despite acknowledging that those populations currently face significant threats. The Service provided no information or analysis indicating whether those protected areas are sufficient to ensure the continued existence of the species, or the role that the meadowfoam on the Project site plays in the genetic variability of the species. Moreover, the Service ignored the best available science when establishing the environmental baseline, including studies published since 2008 finding that meadowfoam habitat is being adversely affected by climate change, which along with habitat loss from development projects like Stonegate, is threatening the continued existence of this protected species.

146. Likewise, when establishing the environmental baseline for the listed vernal pool shrimp the Service erroneously determined that there had been no change in the status of the species since the last status review in 2007, despite the fact that the best available science— including studies published since 2007 that the Service ignored in its Biological Opinion— indicates that vernal pool habitat is increasingly vulnerable to climate change, which may result

in the extirpation of many vernal pool-dependent species. The Service failed to describe current size and health of the shrimp populations on the Project site and provided no information regarding population trends and new threats to the survival of these vernal pool species. *See* FWS, Final ESA Section 7 Consultation Handbook (1997) at 4-21, 22 (providing the "biological or ecological information relevant to formulating the biological opinion," which includes "information on the status and distribution of listed species" such as "rangewide trends" and "new threats"); *see also* 50 C.F.R. § 402.14(h)(1) (requiring the Service to base its jeopardy analysis on a "detailed discussion" of the environmental baseline and the effects of the action on listed species).

147.    Since the Service failed to properly establish the environmental baseline for the vernal pool shrimp and meadowfoam using the best available science, and instead relied on outdated and/or incomplete assertions regarding their current status, the Service failed to ensure that the Project will not jeopardize listed species and the Biological Opinion is arbitrary and capricious, in violation of the ESA and APA.

148.    The Service's Biological Opinion for the Project was therefore arbitrary, capricious and in violation of the ESA and APA, and should be held unlawful, set aside, and remanded to Service.

**SECOND CLAIM FOR RELIEF**

**Violation of the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706, by Defendant Fish and Wildlife Service**

149.    Plaintiffs hereby incorporate by reference each and every allegation set forth in this Complaint as if set forth in full herein.

150.    The APA requires that an agency "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A "more detailed justification" is required when an agency reverses course, adopting a new policy that "rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). Indeed, "an agency's decision to change course may be arbitrary and capricious if the

35

agency ignores or countermands its earlier factual findings without reasoned explanation for doing so." *Id.* at 537 (Kennedy, J., concurring).

151.    The Service violated the APA by departing, without justification, from the agency's previous policy regarding adequate mitigation ratios required for impacts to Butte County Meadowfoam. The Service had previously and routinely required that impacts to meadowfoam from development projects be mitigated at a ratio of 19:1. However, the 2020 Biological Opinion requires a mitigation ratio of less than 4:1 for the Project's impacts to meadowfoam, and fails to provide any justification, scientific or otherwise, for this departure from previous Service policy.

152.    The Service's unjustified departure from previous mitigation policy renders the Biological Opinion for the Project arbitrary, capricious and in violation of the APA, and should be held unlawful, set aside, and remanded to Service.

## THIRD CLAIM FOR RELIEF
### Violation of the ESA by Failing to Consult Regarding Potential Effects on the Listed Species, by all Defendants

153.    Plaintiffs hereby incorporate by reference each and every allegation set forth in this Complaint as if set forth in full herein.

154.    The Corps has an ongoing duty pursuant to ESA Section 7(a)(2) to ensure that Corps-regulated activities are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species critical habitat. 16 U.S.C. § 1536(a)(2).

155.    Giant garter snake ("GGS") has a history of occurring near the Project site, such that an adjacent project was required by the Service to mitigate for potential impacts to GGS. Therefore, the Project meets the ESA's low "may affect" threshold for triggering the agency's Section 7 consultation obligations for GGS. However, the Corps and the Service failed to consider the impacts of the Project on GGS, even though it is known to occur in the area. Indeed, the species is not mentioned in the Memorandum of Decision or the Biological Opinion.

156.    Defendants' failure to enter into consultation regarding the effects of the Project on listed GGS constitutes a failure to ensure that the Project is not likely to jeopardize the

existence of listed species or result in destruction or adverse modification of critical habitat, in direct violation of Section 7 of the ESA, 16 U.S.C. § 1536. Such action is arbitrary and capricious with the meaning of the APA, and in direct violation of Defendants' duties pursuant to the ESA.

157.    Pending completion of the required consultation on GGS, no Project development may move forward. Section 7(d) of the ESA prohibits the Corps from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). The Corps' failure to initiate consultation with the Service regarding the Project's potential to affect GGS therefore bars the Corps from taking any actions that facilitate implementation or further processing of the Project

### FOURTH CLAIM FOR RELIEF

**Violation of NEPA—Inadequate Environmental Analysis and Failure to Prepare Environmental Impact Statement, by Corps Defendants**

158.    Plaintiffs hereby incorporate by reference each and every allegation set forth in this Complaint as if set forth in full herein.

159.    As approved, the Project will result in significant adverse impacts to the environment, including vernal pools and vernal pool species.

160.    The Corps' Environmental Assessment fails to consider all the environmental consequences of the Project, including direct, indirect, and cumulative impacts to wetlands, vernal pools, and endangered and threatened species.

161.    The Corps failed to demonstrate that the Project's significant environmental impacts will be fully mitigated by proposed compensatory mitigation measures.

162.    The Corps failed to evaluate feasible, environmentally superior alternatives to the Project.

163.    The Corps defined the Project objectives in an improperly narrow manner so as to exclude consideration of feasible, environmentally superior alternatives.

164.     The Corps failed to provide the public with notice and opportunity to comment on its Environmental Assessment and FONSI, and failed to provide the public with sufficient environmental information to permit informed decisionmaking.

165.     The Corps violated NEPA by failing to prepare an EIS for the Project.

166.     The Corps' Environmental Assessment and FONSI are arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and were approved without observance of the procedures required by law within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF

**Violation of the CWA and Section 404(b)(1) Guidelines, by Corps Defendants**

167.     Plaintiffs hereby incorporate by reference each and every allegation set forth in this Complaint as if set forth in full herein.

168.     The Clean Water Act requires that the Corps must apply the 404(b)(1) Guidelines to Section 404 permits. 33 U.S.C. § 1344(b).

169.     The 404(b)(1) Guidelines require the Corps to adopt the alternative that best avoids, minimizes, and mitigates of impacts to the aquatic ecosystem while still achieving the Project's purpose as the least environmentally damaging practicable alternative.

170.     The alternative permitted by the Corps would result in unnecessary and avoidable (and therefore unlawful) significant effects on the waters of the United States and surrounding habitat on the Project site, including special aquatic sites identified by EPA as aquatic resources of national importance. The permitted alternative will permanently fill 9.14 acres of waters of the United States, including 5.92 acres of seasonal wetlands, and 2.85 acres of vernal pools, and will permanently impact 1.13 acres of occupied Butte County Meadowfoam habitat and 8.77 acres of habitat occupied by both vernal pool fairy shrimp and vernal pool tadpole shrimp. The permitted alternative will result in the net loss of approximately 170 acres of upland terrestrial habitat associated with the impacted aquatic habitat in the Project area.

38

171.   The permitted action is not the least environmentally damaging practicable alternative as defined by the 404(b)(1) Guidelines. On the contrary, there are other practicable, less-damaging alternatives available that conform to the 404(b)(1) Guidelines.

172.   The Project is not a water dependent activity within the meaning of the 404(b)(1) Guidelines. The Corps did not properly apply the presumption that a practicable alternative exists that would have a less adverse impact on the aquatic environment. 40 C.F.R. § 230.10(a).

173.   The permitted discharge associated with the Project will cause and/or contribute to a significant degradation of the waters of the United States, in contravention of the 404(b)(1) Guidelines. 40 C.F.R. § 230.10(c).

174.   Contrary to the 404(b)(1) Guidelines, the Corps failed to take all appropriate and practicable steps to minimize potential adverse impacts on the aquatic ecosystem associated with the permitted discharge, including the filling of waters of the United States and direct, indirect, and cumulative impacts to habitat for endangered and threatened species. 40 C.F.R. § 230.10(d). The Corps adopted compensatory mitigation without adequately complying with the sequencing regulation that requires that it must first take all appropriate and practicable steps to avoid and minimize the adverse impacts. 33 C.F.R. § 332.1(c)(2). The Corps approved compensatory mitigation for the Project without ensuring that such mitigation would be effective in light of the lack of regionally available mitigation credits for affected vernal pool species and habitat.

175.   The Corps failed to ensure that the permitted discharge complies with all applicable provisions of the 404(b)(1) Guidelines in contravention of its Section 404 regulations. 33 C.F.R. § 332.1(c)(2).

176.   The permitted discharge is contrary to the public interest and the Corps' Section 404 regulations. 33 C.F.R. § 320.4(a).

177.   The Corps' decision to issue the 404 Permit for the Project was arbitrary and capricious, an abuse of discretion, was otherwise not in accordance with law, and was made without observance of the procedures required by law, within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that this Court:

     A.     Declare that the Service's 2020 Biological Opinion is unlawful under the ESA and arbitrary and capricious under the APA;

     B.     Declare that the Corps violated the ESA, NEPA, CWA, and the APA in issuing the Permit for the Stonegate Project;

     C.     Order, through an injunction, that the Service's Biological Opinion be set aside and vacated;

     D.     Order, through an injunction, that the Corps' 404 Permit and Memorandum of Record for the Stonegate Project be set aside and vacated;

     E.     Enjoin any implementation of the proposed Stonegate Project pending completion of a legally adequate Biological Opinion, NEPA analysis, and CWA analysis;

     F.     Award Plaintiffs their costs of litigation, including reasonable attorneys' fees;

     G.     Grant any other relief as the Court deems just and proper.

Respectfully submitted,

Dated: August 25, 2021

               /s/ Ross Middlemiss
               Ross Middlemiss
               John Buse
               CENTER FOR BIOLOGICAL DIVERSITY
               Attorney for Plaintiffs AquAlliance and
               Center for Biological Diversity