1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11   CENTER FOR BIOLOGICAL                No. 2:21-cv-01527-DJC-DMC
     DIVERSITY, et al,
12
                    Plaintiff,
13                                         **ORDER**
           v.
14
     UNITED STATES FISH AND WILDLIFE
15   SERVICE, et al,

16                  Defendant.

17

18        This case concerns the federal government's permitting of the proposed

19   Stonegate Development Project in Chico, California.  Plaintiffs allege that the project –

20   a proposed 314-acre multi-use development with 423 single-family residential lots,

21   13.4 acres of multi-family residential land uses, 36.6 acres of commercial land uses,

22   5.4 acres of storm water facilities, 3.5 acres of park, and a 137-acre open space

23   preserve – would result in a significant loss of local wetland and vernal pool habitats,

24   harming endangered and threatened species that rely on them.  For the reasons

25   discussed below, the Court finds that the government's 2020 approval of the project is

26   at least in part arbitrary and capricious.

27   ////

28   ////

                                          1

**FACTS AND PROCEDURAL HISTORY**

Plaintiffs are AquAlliance and the Center for Biological Diversity ("Center"), two environmental nonprofit organizations. (ECF No. 1, Compl. ¶¶ 9, 14.) Both organizations have members who own property near the proposed project site. (*Id.* ¶ 16.) AquAlliance's mission is to defend northern California waters and challenge threats to the hydrologic health of the Sacramento River watershed. (*Id.* ¶ 9.) The organization has a long history of regional environmental advocacy, which includes purchasing land for purposes of conservation and hosting environmental educational conferences on vernal pools. (*Id.* ¶¶ 10, 11.) AquAlliance's members frequent the area designated for development for purposes of recreation, wildlife viewing, aesthetic enjoyment, and environmental education. (*Id.* ¶ 12.) The Center is a national organization with local members in Butte County, where Chico is located. (*Id.* ¶ 14.) The Center works to protect the habitats and ecological communities that may be adversely affected by human activity. (*Id.*) Both organizations' membership includes scientists who study threatened and endangered species. (*Id.* ¶ 18.)

Federal Defendants are the U.S. Army Corps of Engineers ("Corps") and the U.S. Fish and Wildlife Service ("USFWS"), an agency within the U.S. Department of the Interior. (*Id.* ¶¶ 24, 26.) The Corps is responsible for the Project's compliance with the Endangered Species Act ("ESA"), the Clean Water Act ("CWA"), and the National Environmental Policy Act ("NEPA"). (*Id.* ¶ 26.) The USFWS is tasked with protecting and managing the fish, wildlife, and native plant resources of the United States, in part by ensuring compliance with the ESA. (*Id.* ¶ 24.) The USFWS is also responsible for ensuring that the Corps' permitting decisions comply with the ESA. (*Id.*) Defendant-Intervenors are Epick Homes, Inc and Bruce Road Associates, LP, two developers of the Proposed Project. (ECF No. 9.)

The Stonegate Project ("Project" or "Proposed Project") is proposed on a 314-acre site located on both the east and west end of Bruce Road and north of the Skyway in southern Chico, Butte County, California. (Compl. ¶ 73.) The mixed-use

development project would include 423 single-family residential lots, 13.4 acres of multi-family residential land uses, 36.6 acres of commercial land uses, 5.4 acres of storm water facilities, 3.5 acres of park, and a 137-acre open space preserve. (*Id.*) The location selected for the Project is host to seasonal vernal pool and vernal swale complexes, which are pools that form during the rainy season and dry out during the summer and fall months. (*Id.* ¶ 74.) The vernal pools support a wide variety of wildlife, and the genetic makeup of species in a single vernal pool can vary from that of a nearby pool, making their interconnectivity critical to support the sharing of genetic information between the species. (*Id.* ¶¶ 76, 77.) These species include the vernal pool fairy shrimp (*Branchinecta lynchi*), an aquatic crustacean endemic to vernal pool and ephemeral freshwater habitat that has been listed under the ESA as a threatened species since 1994. (*Id.* ¶¶ 106, 107.) Vernal pool tadpole shrimp (*Lepidurus packardi*), as the name suggests, also share the vernal pool habitat, and have been listed as a threatened species under the ESA since 1994. (*Id.* ¶¶ 114–16.) The Butte County meadowfoam (*Limnanthes floccosa ssp. californica*), an herbaceous annual found only in vernal pool habitat in Butte County, California, has been listed as endangered under the California Endangered Species Act since 1982 and under the ESA since 1992. (*Id.* ¶¶ 121–23.) Finally, the giant garter snake (*Thamnophis gigas*) is a species endemic to Central Valley California wetlands, including wetlands in Butte County, and has been listed as threatened under the ESA since 1993. (*Id.* ¶¶ 134–35.)

Only 10% of the historic vernal pool habitat remains viable in California. (*Id.* ¶ 78.) In 2006, the USFWS released its 2005 Recovery Plan for Vernal Pool Ecosystems of California and Southern Oregon ("2005 Recovery Plan" or "Recovery Plan"). (*Id.* ¶ 109.) The Recovery Plan, which covered both fairy and tadpole shrimp, identified core areas to be the initial focus of protection measures. (*Id.* ¶¶ 109, 110.) The 2005 Recovery Plan recommended that 85% of vernal pool fairy shrimp habitat that existed in 2005 be preserved. (*Id.* ¶ 112.) If completed, the Project would permanently destroy 9.14 acres of wetlands, although some additional meadowfoam habitat may

1    be established through mitigation efforts.  (*Id.* ¶¶ 30, 131.)

2        The Corps issued a public notice for the Project in March 2017, followed by a

3    revised public notice in September 2018.  (*Id.* ¶ 79.)  Forty-one public comments,

4    including comments from Plaintiffs that highlighted potential danger to the vernal

5    pools and the species that rely on them, were received in response to the two public

6    notices.  (*Id.* ¶¶ 79–81.)  Plaintiffs requested a public hearing on the Project and

7    informed the Corps that it believed the Corps would need to prepare an

8    Environmental Impact Statement ("EIS") that includes an adequate list of reasonable

9    alternatives to comply with NEPA.  (*Id.* ¶ 80.)  The USFWS also submitted comments,

10   noting that previous comments it had submitted to a prior iteration of the Project

11   remained unchanged.  (*Id.* ¶ 82.)  Those comments expressed the position that,

12   among other issues, even partial development of the property could preclude

13   recovery of listed species that rely on the vernal pools on the Project site because they

14   would be "significantly and adversely impacted by edge effects of the proposed

15   development."  (*Id.*)  In April 2017, the U.S. Environmental Protection Agency ("EPA")

16   submitted comments reflecting concern for the vernal pools and requesting that there

17   be additional exploration of a least environmentally damaging practicable alternative.

18   (*Id.* ¶ 84.)  And in May 2017, the California Department of Fish and Wildlife submitted

19   comments expressing the view that the Project as proposed would result in significant

20   impacts to the environment and recommended the preparation of an EIS.  (*Id.* ¶ 83.)

21       The Corps ultimately declined to offer a public hearing on the project,

22   concluding that such a meeting would be unlikely to produce additional information

23   to inform the Corps' decision.  (*Id.* ¶ 85.)  In August 2020, the Corps issued its

24   Memorandum for Record for the Project, which constitutes the "Environmental

25   Assessment, 404(b)(1) Guidelines Evaluation, as applicable, Public Interest Review,

26   and Statement of findings for the subject application."  (*Id.* ¶ 86.)  The Memorandum

27   of Record acknowledged the multiple requests received for an alternatives analysis for

28   the Project and identified three offsite alternatives, all of which failed to meet Project

objectives as defined by the Corps. (*Id.* ¶¶ 87–89.) The Memorandum also analyzed six onsite alternatives, assessing factors such as overall project purpose, development cost, and environmental impacts, and concluded that two of those options were not practicable, three were practicable but inappropriate due to insufficient reduction of aquatic impacts of additional adverse effects, and one (Alternative 5) was practicable. (*Id.* ¶ 90.) Alternative 5 would reduce the number of housing units by 10% and impacts to jurisdictional waters by 7%, compared to the proposed Project, although both iterations would include significant development within the parcel east of Bruce Road. (*Id.*) The Corps, in response to EPA and other commenters' request for analysis of an alternative that would only develop the parcel west of Bruce Road, concluded that any such alternative would not meet Project objectives. (*Id.* ¶ 91.) The Corps emphasized that restricting development to west of Bruce Road would fail to meet housing goals and would not reduce impacts to meadowfoam by a significant margin. (*Id.*) Limiting development to the parcel west of Bruce Road would reduce impacts to meadowfoam by 0.10 acres, a 9% decrease compared to the approved project. (*Id.* ¶ 92.) It would also reduce impacted vernal pool fairy shrimp and vernal pool tadpole shrimp occupied habitat by 6.76 acres, a 77% decrease compared to the approved project. (*Id.*)

In March 2019, the USFWS issued the Biological Opinion for the Project, and in December 2019, issued an amended Biological Opinion. (*Id.* ¶ 94.) A second amended Biological Opinion (BO, 08ESMF00-2016-F-0236-3) was issued on January 23, 2020, to address typographic errors. (*Id.*) The amended Biological Opinion addressed revisions to the on-site preserve boundary that excluded the Butte Creek Diversion Channel from the on-site preserve. (*Id.*) The Biological Opinion acknowledged that there would be harm to some ESA-listed species, but that the Project would not jeopardize the continued survival and recovery of the listed fairy shrimp, tadpole shrimp, and meadowfoam. (*Id.* ¶ 95.) The Biological Opinion did not analyze impacts on the listed giant garter snake, which is known to also generally

1    inhabit the Project area.  (*Id.*)

2         The USFWS's conclusions in the Biological Opinion relied on several

3    assumptions, including that there was no change in the status of any of the listed

4    species since status reviews in 2007 for the vernal shrimp and 2008 for meadowfoam,

5    although it did note that there were existing environmental threats to vernal pool

6    habitats.  (*Id.* ¶ 96.)  In its assessment of vernal pool species, the Biological Opinion

7    analyzed the vernal pool fairy shrimp and vernal pool tadpole as different species, but

8    did not differentiate between the two in terms of its jeopardy finding or required

9    conservation measures.  (*Id.* ¶ 97.)  The Biological Opinion permits the purchase of

10   various credits from a mitigation bank, in theory ensuring that the loss of habitat or

11   species in one area can be compensated by the increased population in another area.

12   (*See id.* ¶ 101.)  It is unclear whether the necessary mitigation credits are presently

13   available at USFWS-approved mitigation banks in the region for both the vernal pool

14   shrimp and meadowfoam.  (*Id.* ¶ 102)

15        Plaintiffs bring five claims against Federal Defendants.  First, Plaintiffs allege

16   that the USFWS violated the Endangered Species Act, 16 U.S.C. §§ 1531–44, and the

17   Administrative Procedure Act, 5 U.S.C. §§ 701–06 by failing to fully consider the

18   impacts to ESA-listed species in the Biological Opinion, thus rendering that document

19   arbitrary and capricious.  (*Id.* ¶¶ 139–48.)  Second, Plaintiffs allege that the USFWS

20   violated the Endangered Species Act, 16 U.S.C. §§ 1531–44, and the Administrative

21   Procedure Act, 5 U.S.C. §§ 701–06, by departing, without justification, from the

22   agency's previous policy regarding adequate mitigation ratios required for impacts to

23   Butte County meadowfoam, rendering the new policy arbitrary and capricious.  (*Id.*

24   ¶¶ 149–52.)  Third, Plaintiffs allege that Federal Defendants violated the Endangered

25   Species Act, 16 U.S.C. § 1536, by failing to assess potential impacts on the giant garter

26   snake, which is known to generally inhabit the area of the Proposed Project.  (*Id.* ¶¶

27   153–57.)  Fourth, Plaintiffs allege that the Corps violated the National Environmental

28   Policy Act by rendering an inadequate environmental analysis and failing to prepare

1   an environmental impact statement. (*Id.* ¶¶ 158–66.) Specifically on that claim,

2   Plaintiffs allege that the Corps' environmental assessment failed to consider all

3   environmental consequences of the Project, evaluate feasible environmentally

4   superior alternatives, and provide the public with notice and opportunity to comment

5   on its environmental assessment and Finding of No Significant Impact. (*Id.*) And fifth,

6   Plaintiffs allege that the Corps violated the Clean Water Act, 33 U.S.C. § 1344(b) and

7   Section 404(b)(1) of the Project's Permit Guidelines, by failing to adopt the alternative

8   that best avoids, minimizes, and mitigates impacts to the aquatic ecosystem while still

9   achieving the Project's purpose as the least environmentally damaging practicable

10  alternative. (*Id.* ¶¶ 167–77.)

11         Plaintiffs request that the Court: (1) declare the USFWS 2020 Biological Opinion

12  unlawful under the ESA and arbitrary and capricious under the APA; (2) declare that

13  the Corps violated the ESA, NEPA, CWA, and the APA in issuing the Permit for the

14  Proposed Project; (3) issue an injunction that the Biological Opinion be set aside and

15  vacated; (4) issue an injunction that the Corps' 404 Permit and Memorandum of

16  Record for the Proposed Project be set aside and vacated; (5) enjoin any

17  implementation of the Proposed Project pending completion of a legally adequate

18  Biological Opinion, NEPA analysis, and CWA analysis; (6) award Plaintiffs their costs of

19  litigation, including reasonable attorneys' fees[1]; and (7) grant any other relief as the

20  Court deems just and proper. (*Id.* at 40.)

21         This case was filed in August 2021 and was originally assigned to District Judge

22  Troy L. Nunley. (ECF No. 1.) Plaintiffs moved for summary judgment in July 2022.

23  (ECF No. 30.) The case was reassigned to District Judge Dale A. Drozd in August

24  2022. (ECF No. 33.) Also in August 2022, Federal Defendants moved for summary

25  judgment and to exclude Plaintiffs' extra-record declaration, and Defendant-

26  Intervenor moved for summary judgment in September 2022. (ECF Nos. 38, 39, 41.)

27  ───────────────

28  [1] Should a party seek to recover reasonable costs of litigation, including attorneys' fees, they should submit and notice a separate Motion on this Court's calendar.

1    In April 2023, this case was reassigned to District Judge Daniel J. Calabretta.  (ECF

2    No. 53.)

3                                **LEGAL STANDARD**

4          Ordinarily, summary judgment is appropriate under Rule 56 where the moving

5    party "shows that there is no genuine dispute as to any material fact and the movant is

6    entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, "[i]n a case

7    involving review of a final agency action under the Administrative Procedure Act . . .

8    the standard set forth in Rule 56(c) does not apply because of the limited role of a

9    court in reviewing the administrative record."  *Sierra Club v. Mainella*, 459 F. Supp. 2d

10   76, 89 (D. D.C. 2006).  "A court conducting [Administrative Procedure Act] judicial

11   review does not resolve factual questions, but instead determines 'whether or not as a

12   matter of law the evidence in the administrative record permitted the agency to make

13   the decision it did.'"  *Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-CV-02800-TLN,

14   2014 WL 2092385, at *4 (E.D. Cal. May 19, 2014) (quoting *Mainella*, 459 F. Supp. 2d at

15   90).  In a case brought under the APA, summary judgment is the "mechanism for

16   deciding, as a matter of law, whether the agency action is supported by the

17   administrative record and otherwise consistent with the APA standard of review."

18   *Conservation Cong.*, 2014 WL 2092385, at *4.

19         Because the NEPA, CWA, and ESA – the statutes which Plaintiffs allege

20   Defendants violated – do not allow a private right of action, the agency's decisions is

21   reviewed under the APA.  *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d

22   1233, 1238 (9th Cir. 2005).  Under the APA, a decision may be set aside if it is

23   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

24   *Id.*; 5 U.S.C. § 706(2)(A).  Such review "is narrow and a court is not to substitute its

25   judgment for that of the agency."  *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto.*

26   *Ins. Co.*, 463 U.S. 29, 43 (1983).  Accordingly, a court may only set aside a decision if

27   the agency "has relied on factors which Congress has not intended it to consider,

28   entirely failed to consider an important aspect of the problem, offered an explanation

                                        8

1  for its decision that runs counter to the evidence before the agency, or is so

2  implausible that it could not be ascribed to a difference in view or the product of

3  agency expertise." *Id.*

4  **DISCUSSION**

5    Plaintiffs challenge the USFWS' permitting of the Proposed Project, alleging

6  deficiencies in the: (1) Biological Opinion's finding of "no jeopardy"; (2) assessment of

7  giant garter snake presence at the site of the Proposed Project; (3) analysis of a least

8  environmentally damaging practicable alternative, and; (4) lack of EIS issuance.  The

9  Court discusses each alleged deficiency in turn.

10   **A.  The Biological Opinion's "No Jeopardy" Finding**

11   Undergirding an effort to protect certain species from further deteriorating

12 population numbers, Congress enacted the ESA, which among other things prohibits

13 agency actions that are "likely to jeopardize the continued existence of any

14 endangered species or threatened species."  16 U.S.C. §1536(a)(2).  To jeopardize

15 means "to engage in an action that reasonably would be expected, directly or

16 indirectly, to reduce appreciably the likelihood of both the survival and recovery of a

17 listed species in the wild by reducing the reproduction, numbers, or distribution of

18 that species."  50 C.F.R. § 402.02; *see Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries*

19 *Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008).

20   Plaintiffs bring four subclaims in their argument that the USFWS improperly

21 arrived at a "no jeopardy" finding and that the agency's ultimate conclusion was

22 arbitrary and capricious in violation of the ESA and APA.  First, Plaintiffs allege that the

23 USFWS incorrectly assessed local meadowfoam populations to arrive at a faulty

24 population baseline.  Second, Plaintiffs argue that the USFWS failed to properly

25 account for the impacts of climate change on vernal pool species, rendering the

26 Biological Opinion's assessment of the Proposed Project's impacts on ESA-listed

27 species inadequate.  Third, Plaintiffs assert that the USFWS' meadowfoam impact

28 analysis is in contradiction to its previous findings in a similar project.  And finally,

1  Plaintiffs believe that the USFWS improperly gave credence to unenforceable

2  mitigation efforts.

3        The Court finds that the USFWS properly relied on a series of studies to

4  substantiate the local meadowfoam population baseline.  However, the Court finds

5  that the Biological Opinion's lack of analysis regarding climate change is arbitrary and

6  capricious.  The Court finds that the USFWS' previous conclusions from and reliance in

7  limited part on a 2002 draft biological opinion are not arbitrary and capricious.

8  Finally, the Court finds that the 2005 Recovery Plan is nonbinding, and therefore the

9  Court cannot require enforcement of specific mitigation methods.

10                    **i.    Meadowfoam Baseline**

11        Plaintiffs argue that the USFWS improperly calculated the baseline population

12  number of meadowfoam local to the area of the Proposed Project in violation of the

13  ESA.  Plaintiffs believe that this incorrect baseline negates the USFWS' "no jeopardy"

14  finding as it pertains to the meadowfoam species.  The USFWS asserts that it properly

15  identified four different meadowfoam populations and relied on up-to-date studies to

16  ascertain the species' population numbers.

17        As a requirement for permitting a development, the USFWS must evaluate the

18  impacts that development will have on species listed under the ESA.  Among other

19  things, the ESA requires the USFWS to assess: (1) the current status of the listed

20  species and its "environmental baseline"; (2) the cumulative effects of non-federal

21  action; and (3) the effects of the agency's action.  50 C.F.R. § 402.14(g).  At issue here

22  is whether the USFWS complied with the ESA's first requirement and computed an

23  environmental baseline for the local meadowfoam species.  This baseline must

24  include "the past and present impacts of all Federal, State, or private actions and other

25  human activities in the action area" and "the impact of State or private actions which

26  are contemporaneous with the consultation in process."  50 C.F.R. § 402.02(d).

27        The USFWS' discussion of the meadowfoam baseline in its Biological Opinion is

28  scarce, measuring only a half a page.  AR 000866.  It references six previous studies

conducted over three decades, noting that "[a]s expected for this species, the

population size and extent has been found to vary over time." *Id.* From those studies,

the Biological Opinion concludes that there are 16,542 individual meadowfoam plants

occupying 5.14 acres throughout the proposed project site. *Id.* Plaintiffs attack the

veracity of the final 16,542 number, noting that a 2016 study incorporated into the

Biological Opinion found only 4,303 plants, and that other studies have shown

similarly disparate numbers. (ECF No. 30 at 17.[2]) But as Plaintiffs recognize, "the

available survey counts demonstrate high population variability over time." (*Id.* at 18.).

For example, approximately 9,000 meadowfoam plants were identified in 1988, with

the number dropping to 950 in 2002, and rising again to 10,200 in 2008. AR 002558.

This is likely due to the meadowfoam's seed dormancy, which is believed to be "the

cause of population fluctuations of up to two orders of magnitude between years," as

seeds that do not germinate in their first year may still be viable in subsequent years.

AR 001909. While the USFWS's 16,542 baseline number may be substantially higher

than the 4,303 plants identified in 2016, that increase is not incongruent with the

observed pattern of meadowfoam population growth and decline. Plaintiffs cannot

pick out specific studies relied on by USFWS to distinguish USFWS' final

environmental baseline number without recognizing the overall context of population

change for the species, which fluctuates year to year.

Plaintiffs also contend that the USFWS did not provide an accurate snapshot of

the status of local meadowfoam and the threats facing the species, which would also

render the environmental baseline insufficient. (ECF No. 30 at 18.) Plaintiffs claim that

the USFWS "offers almost no further analysis specific to the condition of the

meadowfoam populations" and "only discusses threats to meadowfoam generally."

(*Id.*) Not so. The Biological Opinion specifically addresses the status of local

meadowfoam, noting that the species is "threatened by land conversion to urban

---

[2] Citations to specific pages in the parties' briefing are to the page number found on the bottom of the document, rather than the Bates number in the upper margin.

development, habitat loss and fragmentation, impacts from surrounding land use,

adjacent road widening, competition with nonnative plant species, potential changes

to hydrology, introduction of pesticides and herbicides, off-road vehicles, stochastic

extinction, and other human activities." AR 000860. The Biological Opinion expands

on its previous observations, including additional discussion of the threat of

"proposed development projects," lack of management of invasive species (including

inappropriate levels of grazing), and species "extirpation." AR 000860. While the

irony of the USFWS explicitly recognizing urban development and related activities as

direct threats to meadowfoam is not lost on the Court, the Court concludes that the

procedural requirement that the USFWS acknowledge and document these threats to

meadowfoam satisfies its obligations to assess the species' status. *See Seven Cnty.*

*Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1507 (2025) ("NEPA

imposes no substantive environmental obligations or restrictions. NEPA is a purely

procedural statute . . .).

The USFWS' reliance on these studies satisfies its obligations under the ESA.

The agency is not expected to conduct its own studies, and its choice here to rely on a

series of studies spanning three decades persuades the Court that the agency did not

act in an arbitrary and capricious manner in assessing the local meadowfoam species'

population numbers. The Court also concludes that that the Biological Opinion

properly identified and discussed threats to the species.

### ii. Climate Change Impacts on Vernal Pool Species

Plaintiffs argue that the USFWS failed to analyze climate change's impacts on

ESA-listed species in contravention of the ESA. They assert that those ESA-listed

species are uniquely adapted to the vernal pool habitat, which is highly susceptible to

changes in precipitation and temperature, and that any discussion offered by the

USFWS merely incorporates "by reference" broader climate change discussions that

are not present in the Biological Opinion. The USFWS responds that it expressly

incorporated climate change into its analysis and discussion of vernal pool species.

1    **a.  Admission of Extra-Record Documents**

2        As an initial matter, the Court must address Federal Defendants' contention that

3    Plaintiffs' submission of a declaration and its attachments, which are two scientific

4    studies that are not part of the administrative record.  (*See* ECF No. 38; *see also* ECF

5    No. 39 at 22.)  Plaintiff argues that it submits these extra-record documents not to

6    attack the basis of the USFWS' conclusions (or lack thereof) regarding climate change,

7    but merely to show "that there is scientific consensus over the basic proposition that

8    [vernal pool] species are being adversely affected by climate change, and not for any

9    site-specific analysis."  (ECF No. 45 at 6.)

10        Plaintiffs attaches the declaration of Ross A Middlemiss, an attorney for

11    Plaintiffs, that itself includes two attachments: a copy of *Climate change impacts on*

12    *vernal pool hydrology and vegetation in northern California*, 574 JOURNAL OF

13    HYDROLOGY, 1003–1013 (2019) by Montrone et al., and *Inundation timing, more than*

14    *duration, affects the community structure of California vernal pool mesocosms*, 732

15    HYDROBIOLOGIA, 71–83 (2014), by Kneitel, J.M.  (ECF No. 30-3.)  Federal Defendants

16    note that neither study was raised during the parties' negotiations over the

17    administrative record, and argue that the studies attack the merits of the Biological

18    Opinion, which puts them outside of the Court's purview.  (ECF No. 38 at 3.)  Should

19    the Court consider the documents, Federal Defendants separately argue that the

20    Court should then also consider the declaration of Michal Fris, who provides

21    substantive rebuttal as to why Plaintiffs' proffered studies do not demonstrate that the

22    USFWS has failed its duties to consider the best available scientific studies as they

23    pertain to contemporary climate change discourse, as required by the ESA.  (*Id.* at 3–

24    4.)

25        Typically, a court reviewing an agency action under the APA will rely solely on

26    the administrative record prepared by and agreed upon by the parties.  *Friends of the*

27    *Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).  However, as relevant here,

28    a plaintiff can submit additional materials outside the administrative record to aid the

13

1  court in weighing "whether the agency has considered all relevant factors and has

2  explained its decision." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004)

3  (internal quotations omitted).

4      The Court will accept Plaintiffs' proffered declaration and attached studies

5  *solely to* assess the parties' claims regarding whether the USFWS properly accounted

6  for the best available scientific studies when making its determination regarding

7  climate change's impact on the vernal pool habitats.  As Federal Defendants properly

8  point out, Plaintiffs cannot present extra-record studies to challenge substantive

9  agency determinations after the fact.  *San Luis & Delta-Mendota Water Auth. v. Locke*,

10  776 F.3d 971, 993 (9th Cir. 2014) ("Although the relevant factors exception permits a

11  district court to consider extra-record evidence to develop a background against

12  which it can evaluate the integrity of the agency's analysis, the exception does not

13  permit district courts to use extra-record evidence to judge the wisdom of the

14  agency's action.").  However, under *Lands Council*, Plaintiffs may present extra-record

15  studies to support their argument that an agency has not weighed all relevant factors,

16  here being the contemporary body of scientific data regarding climate change's

17  impact on vernal pool habitats and the species that depend on them.  As emphasized

18  earlier, the Court will limit its analysis of the studies to their existence and

19  representation that there was contemporary scientific consensus that climate change

20  impacted vernal pools, rather than the intricacies of those studies or their

21  methodologies.

22      The Court will also decline to assess Federal Defendants' proffered Fris

23  Declaration, as it addresses the substance of the articles provided by Plaintiffs and the

24  methods used by the studies' authors.  Because the Court is merely acknowledging

25  the studies' existence rather than their underlying merits and methodologies,

26  consideration of the Fris Declaration is improper and unnecessary.  Further, Federal

27  Defendants identify no binding caselaw that supports their argument that the Fris

28  Declaration should be considered.  Instead, they rely on out-of-district and out-of-

1    circuit caselaw for the proposition that the Court should allow rebuttal to expert

2    witness testimony.  *See*, e.g., *United States v. Jacques*, 784 F. Supp. 2d 59, 66–67 (D.

3    Mass. 2011).  But the Middlemiss Declaration and accompanying studies are not

4    expert testimony, and as emphasized earlier, the Court is not considering the scientific

5    merits of the accompanying articles.  Instead, the extra-record documents are

6    accepted for the narrow purposes of assessing whether the USFWS has met its burden

7    of assessing the best contemporary scientific evidence regarding climate change and

8    its impact on vernal pools.

9                           **b.  Acknowledgment of Climate Change**

10        When drafting a Biological Opinion, an agency must "use the best scientific and

11    commercial data available."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).  In the ESA

12    context, Courts have read this requirement as including agencies to adequately

13    address climate change's impact on ESA-listed spaces.  *Appalachian Voices v. U.S.*

14    *Dept. of Interior*, 25 F. 4th 259, 271 (4th Cir. 2022) ("It is clear, however, that climate

15    change typically must form part of the analysis in some way.") (citing *S. Yuba River*

16    *Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1274 (E.D. Cal.

17    2010)).

18        Vernal pool species are susceptible to the effects of climate change.  *See*, *e.g.*,

19    AR 002027–002028 (certain meadowfoam populations "are less likely to adapt to

20    sudden environmental changes such as global climate change").  Despite this,

21    Plaintiffs allege that the USFWS "failed to incorporate a discussion of [climate

22    change's] threats into any part of its jeopardy analysis."  (ECF No. 30 at 20.)  Federal

23    Defendants concede that the Biological Opinion itself does not include the phrase

24    "climate change," but counter that the Biological Opinion "incorporated documents

25    that discuss the threats the climate change poses for the species" and thus the

26    Biological Opinion's "effects analysis adequately addressed those threats."  (ECF No.

27    39 at 22-23.)

28        It is true that the Biological Opinion references several existing documents

1   (various 5-year reviews for vernal pool species) that expressly discuss climate change's

2   impacts on ESA-listed vernal pool species.  *See*, *e.g.*, AR 001814 (discussing climate

3   change's impacts on vernal pool shrimp).  However, Federal Defendants' assertion

4   that the Biological Opinion "expressly incorporates" those documents is unsupported

5   by the record.  (*See* ECF No. 50 at 13.)  For example, when discussing the status of the

6   vernal pool fairy shrimp, the Biological Opinion merely notes: "For the most recent

7   comprehensive assessment of the rangewide status of the fairy shrimp, please refer to

8   the *Vernal Pool Fairy Shrimp (Branchinecta lynchi) 5-Year Review: Summary and*

9   *Evaluation* (Service 2007a)."  The Biological Opinion does not otherwise incorporate

10  the 5-year review's analysis or discussion of climate change.  AR 000859–000860.  The

11  Biological Opinion goes on to note that "[t]hreats such as the loss of vernal pool

12  habitat primarily due to widespread urbanization were evaluated during the reviews

13  and discussed in the final documents have continued to act on the fairy shrimp and

14  tadpole shrimp since the 2007 5-year reviews were finalized."  AR 000860.  While the

15  Biological Opinion explicitly recognizes the continued threat of urbanization, it does

16  not do so for climate change.  The Biological Opinion then lists other examples of

17  ongoing threats, including those stemming from infrastructure and urbanization, and

18  changes in vernal pool hydrology due to the increase in the runoff associated with

19  infrastructure.  *Id*.  Finally, the Biological Opinion notes that "[i]n addition, truncation

20  or alteration of hydrologic patterns can change the timing and duration of ponding in

21  some types of vernal pools."  *Id*.

22       The Biological Opinion fails to address climate change in the context of its

23  other discussed species.  For example, under its meadowfoam section, it similarly

24  states: "For the most recent comprehensive assessment of the rangewide status of the

25  meadowfoam, please refer to the *Limnanthes floccose ssp. Californica (Butte County*

26  *Meadowfoam) 5-Year Review: Summary and Evaluation* (Service 2008).  AR 000860.

27  Again, it does not otherwise reference climate change when discussing the threats

28  facing the species, nor are any of the threats discussed clearly linked or exacerbated

by climate change.

In *S. Yuba River Citizens League*, a case from this district, the court was confronted with a similar issue of whether it could read in climate change's impacts into more generalized discussion of hydrologic flow effects. 723 F. Supp. 2d at 1273–74. The court found that an agency that failed to expressly mention climate change or discuss its impacts could not rely on general references to changes in water temperature and its effects on ESA-listed species to satisfy its requirement to assess the best scientific available. *Id.* This Court agrees. It is true that the Biological Opinion references documents that themselves expressly discuss climate change and its impacts on the vernal pool species. But the Biological Opinion does not in fact expressly incorporate those documents – it simply refers readers to them and does not otherwise engage with their conclusions regarding climate change or work those conclusions into the Biological Opinion's analysis. Federal Defendants' attempt to tie discussion of other threats facing vernal pool species to climate change is unpersuasive. The Biological Opinion only generally references changes in "hydrologic patterns" and the dangers of "habitat loss," but does not tie either of those threats to climate change. There could be a variety of factors that influence changes in hydrologic patterns or habitat loss, and Federal Defendants' argument that climate change would necessarily be linked to those issues is feeble without any effort to establish a connection between them. This issue is nearly identical to what the court confronted in the *S. Yuba River Citizens League* court, in which the court noted: "Although the [Biological Opinion] discussed present impacts on temperature, the [Biological Opinion] does not address whether global warming will alter the temperature that results from a given flow regime, nor does the [Biological Opinion] address whether global warming will inhibit the ability to provide the presently-anticipated flow regimes." *Id.* at 1274.

Federal Defendants' reliance on *Concerned Friends of the Winema v. McKay*, 614 F. Supp. 3d 756, 774 (D. Or. 2022) for the proposition that the Biological

1    Opinion's climate change analysis is sufficient if it identifies and addresses related

2    effects on a species is misplaced.  (*See* ECF No. 39 at 23.)  That case is arguably

3    somewhat distinguishable because the Biological Opinion at issue there

4    acknowledged, at least facially, climate change's impact on the ESA-listed species.

5    *Concerned Friends of the Winema*, 614 F. Supp. 3d at 774 (noting that the Biological

6    Opinion stated: "historical loss of Oregon spotted frog habitats and lasting

7    anthropogenic changes in natural disturbance processes are exacerbated by the

8    introduction of reed canary grass, non-native predators, *and potentially climate*

9    *change.*").  There, the district court granted summary judgment to the federal agency,

10   the U.S. Forest Service, finding that the Biological Opinion's indirect analysis of

11   climate change was sufficient to comply with the agency's responsibility of addressing

12   the best scientific data available.  *Id.* at 760–70.  In any event, that case was later

13   overruled in part by the Ninth Circuit (after briefing had been completed in the

14   present matter), which noted the Biological Opinion's discussion of climate change

15   was "deficient" because it did "not account for climate change as a cumulative effect

16   or baseline condition."  *W. Watersheds Project v. McKay*, No. 22-35706, 2023 WL

17   7042541, *2 (9th Cir. Oct. 26, 2023).  The Ninth Circuit critiqued the Biological

18   Opinion's lack of assessment on how climate change would impact other local

19   environmental conditions such as changes in water level and streamflow, determining

20   that the Biological Opinion's omission amounted to a "fail[ure] to consider an

21   important aspect of the problem."  *Id.*  Here, as discussed above, the USFWS'

22   Biological Opinion fails to connect any of its identified environmental concerns to

23   climate change.

24        While it is true that Biological Opinions need not be written with absolute

25   clarity, courts must still critically assess whether an agency has sufficiently made clear

26   how it arrived at its ultimate conclusions, such as a finding of no jeopardy.  *Motor*

27   *Vehicle Mfrs. Ass'n.*, 463 at 43.  Here, the general references to threats that may, but

28   not necessarily, implicate climate change is insufficient to satisfy the USFWS's

18

1   responsibility to assess the best scientific data and its duty to incorporate climate

2   change into its analysis.  Accordingly, Plaintiffs identification of additional studies via

3   the Middlemiss declaration, which demonstrate that there was a contemporary body

4   of scientific data discussing climate change and its impact on vernal pool species, are

5   particularly pertinent to establish the USFWS' lack of climate change discussion.  That

6   agency's failure to meaningfully address that body of existing scientific data indicates

7   that its assessment process was arbitrary and capricious.

8         **iii.    The USFWS' Previous Findings Related to Meadowfoam Impact**

9         Plaintiffs point to a previous assessment conducted by the USFWS for a similar

10  local project in which the agency determined that project would jeopardize local

11  meadowfoam populations.  Plaintiffs contend that the USFWS' departure from that

12  position for the Proposed Project in dispute in this case is arbitrary and capricious.

13  Plaintiffs further argue that the Corps' reliance on a different section of that draft

14  biological opinion in rejecting an alternative to the project at issue in this case is

15  indicative that the draft biological opinion is more than just a draft.  Defendants

16  counter that the previous finding was solely a draft and the agency never made a final

17  determination regarding the project's effects on meadowfoam, and therefore, does

18  not conflict with the agency's present conclusions.

19        Plaintiffs identify a 2002 draft biological opinion for the Eastgate development

20  project in southeast Chico, which was a proposed mixed-use project that would

21  impact local ESA-listed species.  AR 008445-008471.  That draft biological opinion

22  found that due to the "critically endangered status of the meadowfoam and the

23  importance of each population to the survival and recovery of this species,

24  preservation of existing habitat, ideally with management for viable populations, is

25  essential to its conservation.  AR 008442; (ECF No. 30 at 21–24.)  That is, the draft

26  biological opinion explicitly recognized that the protection of "each population" of

27  meadowfoam was essential.  The Proposed Project in this case, however, would result

28  in the loss of one of the four local meadowfoam populations, thereby conflicting with

1    the agency's previous conclusions that protection of all the local populations was

2    "essential." (ECF No. 39 at 12;) *see* AR 008442. Plaintiffs posit that the threats facing

3    meadowfoam populations have not abated since 2002, and thus, USFWS' current

4    conclusion that meadowfoam species would not be placed in jeopardy by the

5    Proposed Project is contradictory of its previous finding and therefore arbitrary and

6    capricious. Defendants, in response, note that the current Proposed Project includes

7    mitigation measures ameliorating the development's effect on meadowfoam that

8    were not present in the Eastgate project's plans. (*See* ECF No. 39 at 18.) The

9    inclusion of mitigation measures distinguishes, at least somewhat, the previous

10    tentative conclusion regarding jeopardy to meadowfoam from the current Proposed

11    Project's finding.

12         Federal Defendants also fairly note that the 2002 document to which Plaintiffs

13    point is a draft document that was never finalized and was therefore subject to

14    change. (ECF No. 39 at 15–16;) *see United States Fish & Wildlife Serv. v. Sierra Club,*

15    *Inc.*, 592 U.S. 261, 270–71 (2021) (draft biological opinions allow for the "possibility of

16    postcirculation changes"). To rebut this, Plaintiffs point out that Defendants relied in

17    part on the 2002 Eastgate draft biological opinion when assessing the Proposed

18    Project at issue in this case. *See* AR 35:000368. The Corps, in weighing the merits of

19    off-site Alternative 2 to the Proposed Project (Defendants' requirement to assess

20    alternatives will be discussed later in this Order), state:

21

22         This alternative is a 215-acre parcel located south of Humboldt
        Road in the eastern portion of the City of Chico. Dead House Slough is

23        located to the north of the parcel. Little Chico Creek is south of the parcel.
        The parcel is zoned by the City of Chico as Low Density

24        Residential/Resource Constraint. The parcel is located in the foothills with
        substantial topographic relief. The parcel is designated as an FD-SD

25        overlay zone, which means it has substantial topographic relief and would

26        require site-specific design solutions to develop. Access to the site is
        limited to Humboldt Road with no alternative access. Development

27        would require extensions of utilities, as well as water and sewer services
        to the site. As of 2018, the City of Chico was considering closing

28

Humboldt Road. In addition, based on a review of aerial photography, the site appears to be bisected by a drainage and several tributaries to this main drainage exist. The site also appears to have mima mound topography which is likely to support vernal pools or other seasonal wetlands. The western portion of the site is also designated as critical habitat for [meadowfoam] and was subject to a draft Jeopardy Biological Opinion for a previously proposed Eastgate Project development. The USFWS stated in their draft jeopardy opinion that development of the site would jeopardize the continued existence of [meadowfoam]. Based on this information, we have determined the development of [Alternative 2] would result in increased adverse effects to the environment. Therefore, this alternative has been eliminated from consideration.

AR 35:000368.

On this point, it is not clear to the Court whether Alternative 2 was rejected solely because of the 2002 draft biological opinion's findings, or whether there were additional factors considered. While the Corps identifies additional considerations beyond the project's effects on meadowfoam such as the need for "site-specific design solutions" and "extensions of utilities, as well as water and sewer services to the site," the Corps' analysis does not indicate how much weight those factors were given, if any, as opposed to the environmental impacts in its rejection of Alternative 2.

The Court shares Plaintiffs' concern that Federal Defendants are picking elements of the 2002 draft biological opinion to rely on when convenient while simultaneously disavowing the opinion as merely a draft when it conflicts with Federal Defendants' contemporary conclusions. However, as both parties recognize, the 2002 draft biological opinion is just that – a draft. The Corps' reliance on the draft opinion appears to be limited and cabined to the analysis of an alternative to the project that would be precisely where the once-proposed Eastgate project was. That is, the USFWS did not act improperly by failing to impute the preliminary findings of a draft biological opinion to an entire new project when that draft opinion was focused on development of a certain parcel that is different from where the new project is proposed to be placed.

The Court recognizes that the underlying merits regarding ESA-listed species in

21

1   the 2002 draft biological opinion appear at least in part at odds with the conclusions

2   of the finalized 2019 Biological Opinion implicated in this case, and the Court does

3   not mean to downplay this inconsistency.  But given the unfinalized status of the 2002

4   draft biological opinion, the Corps' identification of distinguishing factors such as the

5   contemporary mitigation measures not present in the Eastgate project's plans, and the

6   Corps' limited reliance on it the draft opinion, the Court declines to view the 2002

7   draft biological opinion's conclusions as binding precedent to which Federal

8   Defendants must adhere.  Accordingly, the Court finds that any citation to or reliance

9   on the draft biological opinion does not conflict with Federal Defendants' conclusions

10   on the current Proposed Project and is not arbitrary and capricious.

11          **iv.    Credence Given to 2005 Recovery Plan and Unenforceable**

12                   **Mitigation Methods**

13          Plaintiffs assert that that the USFWS' own 2005 Recovery Plan for vernal pool

14   species called for significant conservation efforts that are incongruent with the

15   agency's later decision to permit the Proposed Project.  Further, Plaintiffs point to

16   mitigation methods identified in the 2005 Recovery Plan that the agency relies on but

17   are not enforceable and have not been tested as viable options.  The USFWS counters

18   that its 2005 Recovery Plan is itself not a binding document, and that developers of

19   the Proposed Project are not tied to particular mitigation methods, although they

20   must utilize *some* mitigation measures in general.

21          The 2005 Recovery Plan calls for 85% of local vernal pool fairy shrimp habitat

22   and 95% of vernal pool tadpole shrimp and meadowfoam habitat to be preserved,

23   while the Proposed Project is slated to only preserve 20% of vernal pool shrimp

24   habitat and 80% meadowfoam habitat.  *See* AR 000867.  But, Federal Defendants are

25   correct that recovery plans, such as the 2005 Recovery Plan at issue here, are not

26   binding.  *Conservation Cong. v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014) ("Recovery

27   Plans are prepared in accordance with section 1533(f) of the Endangered Species Act

28   for all endangered and threatened species, and while they provide guidance for the

1    conservation of those species, they are not binding authorities.").  While Plaintiffs'

2    reliance on the actual text of 16 U.S.C. section 1533(f)(1), which states that USFWS

3    "*shall* develop and implement plans" (emphasis added), does demonstrate the

4    agency's requirement to effectuate environmental conservation efforts, the agency's

5    approach here of referencing the 2005 Recovery Plans for various vernal pool species

6    appears consistent with its requirement.  *See, e.g.*, AR 000860.  The agency has some

7    leeway in *how* it preserves the habitats it identified and which mitigation efforts may

8    be utilized by developers, and a recovery plan is only a non-final step in that process.

9    *See Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 418 (9th Cir. 2023)

10   ("Moreover, a recovery plan does not contain any 'binding legal obligations to which

11   [the agency] is subject.'") (quoting *Whitewater Draw Nat. Res. Conservation Dist. v.*

12   *Mayorkas*, 5 F. 4th 997, 1009 (9th Cir. 2021)).  That is, the recovery plan is more of a

13   roadmap than a legal obligation.

14          Mitigation measures proffered by a Biological Opinion must constitute a "clear,

15   definite commitment of resources" and be "under agency control or otherwise

16   reasonably certain to occur."  *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723,

17   743 (9th Cir. 2020) (internal quotations omitted).  Even though the 2005 Recovery Plan

18   is nonbinding, Federal Defendants do point to a number of mitigation possibilities

19   identified in the Plan as a basis for allowing the Proposed Project to proceed.  *See* AR

20   000864.  However, adherence to those specifically identified mitigation methods

21   appears unenforceable, and the mitigation methods themselves are vague.  *See id.*

22   For example, a proposed mitigation method for meadowfoam conservation is the

23   transfer of that species' seeds to create a new occupied habitat in the Proposed

24   Project's onside reserve.  AR 000859.  But, there is no binding requirement in the

25   Biological Opinion that the onsite preserve be enacted, meaning there is no

26   guarantee that seed transfer would occur.  Another mitigation method identified in

27   the Biological Opinion is the utilization of mitigation credits for a meadowfoam seed

28   bank, yet the USFWS does not identify whether those credits are available, or

1  purchasing another meadowfoam-occupied parcel, which again, the agency has not

2  determined is possible.  *See id.*

3     Federal Defendants push the onus of determining the viability of these

4  mitigation measures onto the developers.  (ECF No. 39 at 21 ("[T]he developer

5  proposed the alternative conservation methods for [the USFWS] to consider in the

6  [Biological Opinion], so it was reasonable for [the USFWS] to assume that the

7  developer could carry out the conservation measures it proposed.")  The Court is

8  somewhat troubled by this approach.  *See Selkirk Conservation All. v. Forsgren*, 336

9  F.3d 944, 955 (9th Cir. 2003) ("Even given the cooperation of private entities, the

10  agencies must vigilantly and independently enforce environmental laws.")  However,

11  as emphasized earlier, the 2005 Recovery Report need not be binding on the agency

12  or developers.  *Cascadia Wildlands v. Bureau of Indian Affs*, 801 F.3d 1105, 1114 n.8

13  (9th Cir. 2015) ("The Endangered Species Act does not mandate compliance with

14  recovery plans for endangered species.").  Accordingly, any mitigation methods

15  identified the 2005 Recovery Report need not be made enforceable by a Biological

16  Opinion, and their identification and the general requirement that there be some

17  mitigation measures satisfies the Report's duty of creating a roadmap of viable

18  mitigation actions for developers and the agency.  Although the Court is circumspect

19  of relying so heavily on the developers' identification of conservation methods without

20  oversight from the USFWS, the Court declines to view the agency's reliance on the

21  2005 Recovery Report's (nonbinding) mitigation measures as arbitrary and capricious.

22     **B.  Presence of Giant Garter Snake at the Proposed Project Site**

23     Permitting agencies must assess the direct and indirect effects of a proposed

24  development on all ESA-listed species that would be impacted by that development.

25  50 C.F.R. § 402.02; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir.

26  2011).  But "if the agency determines that a particular action will have no effect on an

27  endangered or threatened species, the formal consultation requirements are not

28  triggered."  *Protect Our Water v. Flowers*, 377 F. Supp. 2d 844, 871 (E.D. Cal. 2004)

1  (citing *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n.8 (9th Cir.1994)).

2      In assessing the Proposed Project, the Federal Defendants did not account for

3  any impacts on the ESA-listed giant garter snake, finding that the proposed

4  development site does not contain sufficient suitable habitat for the snake and that

5  there have been no documented occurrences of the snake within five miles of the site.

6  The analysis of this issue by the Corps provided, in relevant part:

> There are no CNDDB occurrences of this species within five miles of the
> Action Area (CDFW 2018). The Action Area contains Butte Creek
> Diversion Channel with steep banks that are perennially inundated.
> However, the Butte Creek Diversion Channel does not provide vegetative
> cover and is too shallow during the snake's active period (April through
> October) to support habitat for this species. The depressional perennial
> marsh provides marginal habitat for GGS. However, it is too small
> (approximately 1.24 acres) to support a GGS population and the
> depressional perennial marsh is not in the vicinity of other suitable habitat
> or corridors that would connect to known populations of GGS. Given the
> lack of suitable habitat within the Action Area coupled with the absence
> of occurrences in the vicinity, this species is not expected to occur on or
> near the Action Area. Therefore, this species is not expected to be
> affected by the Proposed Action and is not addressed further in this BA.

16  AR 250:005400.

17      Plaintiffs contest this finding, alleging that the giant garter snake has been

18  found at and within five miles of the site, and that regardless, the agency should

19  assume its presence given the availability of the snake's habitat in the project site.

20  Further, Plaintiffs point to studies conducted as part of the development process of

21  adjacent sites, which found the need to assess impacts on the giant garter snake.

22      Giant garter snakes live in upland and aquatic habitats, which the parties agree

23  are present at the proposed project site.  (ECF No. 30 at 26; ECF No. 39 at 26–27;) AR

24  000896.  This includes vegetative cover such as cattail, which are present within the

25  Proposed Project area's freshwater marshes.  AR 002276.  Additionally, giant garter

26  snakes have been observed using burrows for refuge in the summer as much as 50

27  meters away from the edge of marsh habitats.  AR 008152.  Defendants argue that the

28  giant garter snake habitat within the Proposed Project is too small to support a snake

25

1    population, noting that it is only approximately 1.24 acres, and that regardless of the

2    present suitable habitat, there have been no sightings of the snake.  AR 250:005400.

3         Contrary to Federal Defendants' claim that the giant garter snake is not present

4    in the area, there have been sightings of at least one giant garter snake within five

5    miles of the proposed site at a nearby location called Dead Horse Slough.  AR 005067

6    ("A giant garter snake [] was sighted during a sight visit in close proximity to Dead

7    Horse Slough, therefore [giant garter snake] habitat is assumed to exist within Dead

8    Horse Slough.").  After first claiming that there have been no documented sightings of

9    a giant garter snake in the area (ECF No. 39 at 26–27), Federal Defendants then

10   shifted their argument to be that the one sighting identified by Plaintiffs is separated

11   from the Proposed Project site "by State Route 32 and a distance of about a mile that

12   includes residential and commercial development" (ECF No. 50 at 15).  While this may

13   be true, the underlying reasoning of the Biological Opinion's finding of "no effect" on

14   the giant garter snake is premised on the assumption that the species "has not been

15   detected within five miles of the action area."  (ECF No. 39 at 28; *see id.* at 29 (noting

16   Federal Defendants' argument that "it is undisputed that no [giant garter snake]

17   occurrence has ever been recorded within five miles of the Stonegate Project action

18   area")).  Federal Defendants may not retroactively change their argument in their

19   Reply after Plaintiffs identify faulty assumptions underlying Defendant's Biological

20   Opinion.  If the specific location of the giant garter snake sighting was significant, that

21   must have been addressed by the USFWS during the permitting process, rather than

22   justified by post-hoc rationalizations in Federal Defendants' briefing.

23        Separately, Plaintiffs point to nearby developments that accounted for giant

24   garter snakes during their permitting process.  (*See* ECF No. 30 at 26–28.)  These

25   projects are the State Route 32 Widening Project (AR 000888–000907) and the

26   Meriam Park Development Project (AR 001740–001769).  Both projects are in the

27   same vicinity as the Proposed Project, and both assessed potential impacts on the

28   giant garter snake.  For example, the State Route 32 Widening Project determined

26

1   that "[t]he snake is assumed to occur in Dead Horse Slough, and because of the

2   presence of suitable habitat, the Service believes that the snake is reasonably certain

3   to occur within the proposed project's action area and, therefore, the proposed

4   project is likely to adversely affect the snake." AR 000896. And, the Meriam Park

5   Development Project found that "[t]he proposed project would permanently destroy

6   3.6 acres and temporarily affect (over multiple seasons) 5.69 acres of giant garter

7   snake habitat." AR 001743.

8        Federal Defendants seek to distinguish these two projects. (*See* ECF No. 39 at

9   28.) They argue first that the State Route 32 Widening Project merely assumed that

10  there were giant garter snakes at the development location. (*Id.*) But critically, the

11  USFWS itself acknowledged the potential effect on the snake on the State Route 32

12  Widening Project, noting that "because of the presence of suitable habitat, the Service

13  believes that the snake is reasonably certain to occur within the proposed project's

14  action area and, therefore, the proposed project is likely to adversely affect the snake

15  through temporary loss of 0.227 acres of potential aquatic habitat and permanently

16  destroy 1.519 acres of upland habitat and 0.093 acres of aquatic habitat." AR 000896.

17  So it was not just that the Widening Project assumed snakes were there – USFWS itself

18  supported that assumption.

19       Federal Defendants further counter that the amount of giant garter snake

20  habitat at the Proposed Project site is "marginal." (ECF No. 39 at 28.) As an initial

21  matter, comparing the acreage at issue in the Proposed Site and that of the Widening

22  Project, the Court is unclear why the former is marginal and the latter is cause for

23  concern; the Biological Opinion does not discuss this matter in any depth. More

24  significantly though, the Biological Opinion's reasoning that the habitat is marginal is

25  expressly "coupled with the absence of occurrences [of giant garter snake] in the

26  vicinity" and with the assumption that there have been no "occurrences of this species

27  within five miles of the Action Area." AR 250:005400. But as discussed above, there

28  has been at least one sighting of the giant garter snake within five miles. It is

27

1    impossible for the Court to decouple Federal Defendants' reliance on the small area

2    of habitat and its erroneous assumption that there had been no sightings of the snake

3    in the area.

4        As for the Meriam Park Development Project, Federal Defendants contend that

5    that development affected nearly nine times the amount of giant garter snake habitat,

6    and again that there had been no local sightings of the snake.  (ECF No. 39 at 28–29.)

7    But that does not detract from Plaintiffs' point that assessment of giant garter snake at

8    the Proposed Project sight is improperly tied to an assumption that there have been

9    no snake sightings.  And both projects indicate that it would be reasonable to account

10   for their presence absent some valid justification as to why doing so was unnecessary.

11       Both sides cite to *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006

12   (9th Cir. 2012) for the proposition that the USFWS must assess whether an ESA-listed

13   species will be affected, and that the agency is only discharged from further

14   assessment if it properly finds that there would be "no effect" on the species.  Here,

15   the agency's conclusion that the Proposed Project would have no effect on the species

16   makes sense if premised upon the assumption that no snake has been sighted in the

17   area.  But Plaintiffs have identified that there has been at least one giant garter snake

18   sighting in the area.  And while the Proposed Project contains giant garter snake

19   habitat, and other nearby projects accounted for potential habitat loss, Federal

20   Defendants reached the conclusion that the species would not be affected by the

21   Proposed Project, despite acknowledging separately that development tends to

22   significantly impact the species and its habitat.  As in *Karuk Tribe*, Plaintiffs have thus

23   identified a species and habitat that would be affected by the Proposed Project but

24   that have not been properly accounted for, evincing the Federal Defendants'

25   noncompliance with the ESA.

26       To sum, the Court finds that Federal Defendants' failure to consider potential

27   effects on the ESA-listed giant garter snake was based on a faulty assumption that

28   there have been no sightings of the snake within five miles of the project renders its

1    Biological Opinion arbitrary and capricious.  The Court appreciates that this

2    conclusion is based on the single sighting of a giant garter snake twelve years before

3    the no-effect finding was issued for the Proposed Project.  And it may well be that,

4    after a more thorough analysis, Federal Defendants conclude the project will in fact

5    have a minimal impact on the snake.  But the factual underpinning that was used to

6    justify conducting *no* analysis of the giant garter snake – that there have been no

7    sightings within five miles of the project – is simply incorrect, rendering the Biological

8    Opinion invalid.  Moreover, this sighting is in the context of the fact that the project

9    type contains the appropriate habitat for the giant garter snake, and that nearby

10   projects accounted for the presence of the giant garter snake, including at the

11   USFWS's urging in at least one circumstance.  The Court therefore grants Plaintiffs'

12   request for summary judgment on this issue.[3]

13       **C.  LEDPA**

14       The CWA aims to "restore and maintain the chemical, physical, and biological

15   integrity of the Nation's waters" by prohibiting the unpermitted discharge of

16   pollutants into navigable waters of the United States.  33 U.S.C. §§ 1251(a), 1311(a).

17   The Corps, under oversight from the EPA, issues permits for discharges of dredged or

18   fill materials.  *Id.* § 1344(a)–(c).  When issuing this type of permit, known as a Section

19   404 permit, the Corps must follow binding guidelines set out in EPA regulations (the

20   "404(b)(1) Guidelines" or "Guidelines").  33 U.S.C. § 1344(b); 40 C.F.R. Ch. 1, Subch. H,

21   Pt. 230.  The applicant bears the burden of proving that no practicable alternatives

22   exist.  *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir.

23   2002) (citing *Res. Invs., Inc. v. U.S. Army Corps of Eng'rs*, 151 F.3d 1162, 1167 (9th Cir.

24   1988)).

25       The Corps may not issue a Section 404 permit if there is a "practicable

26

27   _____

     [3] Separately, the parties agree the Court should grant summary judgment on to Federal Defendants on
     the failure-to-consult claim against the Corps, and the Court will do so.  (*See* ECF No. 44 at 25–26, n.12

28   (expressly conceding the point to Defendants).)

1    alternative to the proposed discharge which would have less adverse impact on the

2    aquatic ecosystem" and which "does not have other significant adverse environmental

3    consequences." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available

4    and capable of being done after taking into consideration cost, existing technology,

5    and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). The

6    Guidelines prohibit the Corps from permitting anything other than the least

7    environmentally damaging practicable alternative ("LEDPA"). *See* 40 C.F.R.

8    §230.10(a).

9         Here, Plaintiffs argue that the Corps failed to adopt the LEDPA as required

10    under the CWA, and therefore the subsequent issuance of the Section 404 permit is

11    improper. (ECF No. 30 at 29–32.) Specifically, Plaintiffs allege that the official LEDPA,

12    known as Alternative 5, considered by the Corps was not actually the least damaging

13    alternative; Plaintiffs view the actual LEDPA as being either Alternative 1 or the "Bruce

14    Road Alternative" (although Federal Defendants fairly and correctly point out that

15    Plaintiffs appear to conflate the two). (*Id.*) Federal Defendants counter that the Corps

16    and Defendant-Intervenor considered three off-site alternatives, five on-site

17    alternatives, and a no-action alternative. (ECF No. 39 at 29.) Alternative 1 would

18    develop 117 acres of land, including land east of Bruce Road. AR 35:000369; AR

19    308:006278-79, 308:006315. Meanwhile, the Bruce Road Alternative, which is indeed

20    distinct from Alternative 1, would restrict development to the 50-acre parcel west of

21    Bruce Road. AR 302:006071. The Court finds that Defendants jointly proffer sufficient

22    reasons for not considering these alternatives as viable, and therefore finds that there

23    is no violation of the CWA.

24         **i.    Alternative 1**

25         The Corps must consider cost in its LEDPA analysis. 40 C.F.R. § 230.10(a)(2);

26    *Friends of the Earth v. Hintz*, 800 F.2d 822, 833 (9th Cir. 1986) ("The regulations

27    explicitly charge the Corps with taking [into consideration] cost"). Plaintiffs appear to

28    argue that Defendants improperly rejected Alternative 1 for cost reasons, noting that

1  Alternative 1 would result in an estimated "19 percent increase in the cost per

2  developable acre from $256,266 to $305,034."  (ECF No. 30 at 31); *see* AR 35:000369.

3  Plaintiffs attack the rejection of Alternative 1 on the basis that there is no evidence in

4  the administrative record of the increase in cost or how that would render Alternative

5  1 impracticable.  But, there is evidence in the administrative record that the increase in

6  costs and decrease in project scope would render the project financially unviable.  For

7  example, Defendants jointly assessed the costs and determined that "the 19%

8  increase in cost per developable acre would be distributed over a substantially

9  decreased development potential (57% decrease in development footprint acreage),

10  resulting in cost per unit (for residential development) and cost per square foot (for

11  commercial development) exceeding regional prices and adversely affecting this

12  development from providing an economically viable project with competitive prices."

13  AR 301:006027.  And in a subsequent study, Defendant-Intervenor supplied data to

14  the Corps on current regional costs, bolstering the conclusion that Alternative 1

15  simply was not economically feasible.  *See* AR 296:005979–005982.

16      In sum, Defendants reasonably rejected Alternative 1 on economic viability

17  grounds.  This alone is sufficient to remove Alternative 1 from consideration, and

18  therefore, the Court will not view Alternative 1 as the LEDPA.

19      **ii.    Bruce Road Alternative**

20      Plaintiffs also propose that the Bruce Road Alternative may be the LEDPA.

21  Defendants counter that the Bruce Road Alternative was rejected due to its reduced

22  scope, which would not satisfy the Project's goal of meeting Chico's housing needs

23  and commercially activating the Bruce Road corridor.  Given the various purposes

24  prompting the development, Defendant-Intervenors determined that the

25  development would need to be approximately 200 acres.  AR 306:006203.  The Bruce

26  Road Alternative would limit the Proposed Project to 50 acres.  (*See* ECF No. 39 at 35.)

27  The administrative record supports Defendants' joint contention that the Bruce Road

28  Alternative was rejected because it cannot meet the various needs of the Proposed

1  Project based in on its limited size.  *See* AR 302:006071.  Simply put, reducing the

2  proposed acreage of the project by 75% would severely limit its ability to meet

3  Chico's identified housing and commercial needs.  Rejecting this small-scale version

4  of the project was proper.

5          **D. Preparation of an EA and not an EIS**

6          Prior to implementing certain agency actions, an agency must first prepare an

7  environmental assessment, or "EA," describing initial environmental impacts of the

8  action.  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d

9  1172, 1185 (9th Cir. 2008) (citing 40 C.F.R. § 1508.9(a)(1)).  An EA is a "'concise public

10  document' that '[b]riefly provide[s] sufficient evidence and analysis for determining

11  whether to prepare an environmental impact statement or a finding of no significant

12  impact.'"  *Id.* (quoting 40 C.F.R. § 1508.9(a)(1)).  For "major Federal actions

13  significantly affecting the quality of the human environment" or instances where

14  substantial questions are raised as to potential environmental effects, NEPA requires a

15  federal agency to prepare an environmental impact statement, or "EIS."  42 U.S.C.

16  § 4332(2)(C); *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864–65 (9th

17  Cir. 2004).  An EIS is not required if the EA does not find that there will be a significant

18  environmental impact; in those instances, an EA is sufficient.

19          Here, the Corps prepared only an EA, and finding that there would be no

20  significant environmental impact, did not subsequently prepare an EIS.  Plaintiffs

21  challenge this determination and allege that the Corps should have prepared an EIS

22  due to the substantial questions raised on the Proposed Project's environmental

23  impacts.  (ECF No. 30 at 33–37.)  Federal Defendants argue that the Corps fully

24  complied with its NEPA obligations because there were no substantial questions

25  raised as to the environmental effects, and accordingly, the Corps did not need to

26  prepare an EIS.  (ECF No. 39 at 37–42.)

27          "To determine whether an action 'significantly' affects the environment,

28  agencies must consider both the 'context' and 'intensity' of the possible effects."  *Am.*

32

1    *Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1007 (9th Cir. 2020) (citing 40

2    C.F.R. § 1508.27).  Intensity refers to the severity of impact, and NEPA regulations

3    include ten intensity factors that agencies must consider.  An action may be, but is not

4    necessarily, significant if any one of those factors is met.  *Id.* at 1008 (internal citation

5    and quotations omitted).

6            Courts can consider many factors when assessing intensity, and all need not be

7    present in any given case.  *See id.*  As to the intensity of the Proposed Project, Plaintiffs

8    first argue that there is a substantial question as to the environmental impacts of the

9    Proposed Project.  (ECF No. 30 at 34.)  Plaintiffs point to numerous state and federal

10    entities, including the EPA, California Department of Fish and Wildlife, the USFWS,

11    and the City of Chico, all of whom have raised at least some level of concern

12    regarding the environmental impacts of the project.  *See* AR 310:006326; AR

13    351:006703; AR 00851; AR 346:006687–006688.  However, Federal Defendants fairly

14    point out that those comments predate the addition of an extensive mitigation plan

15    being added to the Project's plans.  *See* AR 35:000384.  The comments identified by

16    Plaintiffs respond to an outdated version of the project, which did not incorporate

17    additional mitigation measures.  *See, e.g.*, AR 351:006703 (submission from California

18    Fish and Wildlife Service cabining its comment in response to the Project "[a]s

19    described in the public notice"); *see also* AR 351:006706 (submission from same

20    agency noting that its comments are toward "the Project as proposed").  The

21    mitigation measures adapted are, at least on paper, significant.  For example, they

22    include the proposed purchase of 12.22 seasonal wetland creation credits from the

23    Colusa Basin Mitigation Bank and 4.28 vernal pool establishment credits at the

24    Meridian Ranch Mitigation Bank (AR 35:000365), the elimination of development east

25    of the Butte Creek Diversion Channel and the elimination of a utility line crossing that

26    Channel (AR 35:000384), and the establishment of a 132-acre water preserve (AR

27    35:000384).  On balance, the Court is not convinced that the substance of the

28    comments represents a substantial question, given that they do not address the most

1    recent iteration of the project, and due to the substantive differences between the

2    Project's iterations.

3        Second, Plaintiffs emphasize that the project would cause permanent impacts

4    to an ecologically sensitive area and that it would adversely affect ESA-listed species

5    and their habitats.  (ECF No. 30 at 34.)  Plaintiffs point to the EPA, which did initially

6    raise concerns about the project.  However, the EPA then declined to elevate its

7    concerns following the addition of mitigation efforts discussed, as discussed in the

8    preceding paragraph.  AR 198:003836.  The decision of the EPA not to repursue its

9    comments regarding the Proposed Project is indicative to the Court of the weight of

10   the mitigation measures added to the project to the EPA, and the Court will decline to

11   view the EPA's original comments as an indicator of the current iteration of the

12   Project's impacts.[4]

13       Third, Plaintiffs argue that the project's controversial nature supports the need

14   to develop an EIS.  (ECF No. 30 at 35.)  Plaintiffs point to numerous comments

15   submitted by community members, agencies, and organizations regarding the

16   development.  (*Id.*)  But "[m]ere opposition to an action does not, by itself, create a

17   controversy within the meaning of NEPA regulations."  *Am. Wild Horse Campaign*, 963

18   F.3d at 1011.  Instead, a plaintiff must "cast [] serious doubt upon the reasonableness

19   of the agency's conclusions."  *Id.* (quoting *Humane Soc'y of U.S. v. Locke*, 626 F.3d

20   1040, 1057 (9th Cir. 2010)).  But in doing so, Plaintiffs rely on the previous California

21   Department of Fish and Wildlife and EPA comments.  (ECF No. 44 at 39.)  The Court

22   has already determined that those comments do not address the most up-to-date

23   project iteration, and therefore, carry less force.  And, the mere submission of dozens

24   of comments submitted regarding the Proposed Project does not inherently render

25

26   [4] As discussed earlier in this Order, the Court acknowledges the criticisms of the nonbinding nature of
     specific mitigation measures.  However, given the various agencies' decision not to submit additional
27   comments following the addition of the mitigation measures to the Proposed Project, the Court
     concludes that *those* agencies found the mitigation measures sufficient to ameliorate any previously
28   existing concerns.

1    the Project controversial. *See Am. Wild Horse Campaign*, 963 F.3d at 1006–07, 1011–

2    12 (holding that an agency decision that garnered nearly 5,000 public comment

3    letters was not controversial).

4         While it is true that the Court has concerns with the Biological Opinion on which

5    the EA relies, that does not render the project "controversial" such that an EIS was

6    required.  That is because, at this stage, the failure to consider climate change and the

7    giant garter snake are procedural in nature, and the Court cannot conclude that either

8    issue will render the project sufficiently controversial to warrant an EIS.  For example,

9    on remand, Federal Defendants may conclude that the impacts of climate change and

10   effects on the giant garter snake are not significant.  On the other hand, on a harder

11   look at these issues, the Corps may determine that it should prepare an EIS; nothing in

12   this Order prevents the Corps from doing so.  But on this record, Plaintiffs have not

13   established that there is sufficient environmental debate within the agencies that

14   would necessitate an EIS, especially given the Court's deferential review to the

15   agency. *See Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

16                                      **CONCLUSION**

17        For the reasons discussed above, Plaintiffs' Motion for Summary Judgement

18   (ECF No. 30) is GRANTED IN PART and DENIED IN PART.  Federal Defendants' Cross-

19   Motion for Summary Judgment (ECF No. 39) and Defendant-Intervenors' Cross-

20   Motion for Summary Judgment (ECF No. 41) are GRANTED IN PART and DENIED IN

21   PART.  Federal Defendants' Motion to Exclude Plaintiffs' Extra-Record Declaration

22   (ECF No. 38) is DENIED.  The Court declares the USFWS 2020 Biological Opinion

23   unlawful under the ESA and arbitrary and capricious under the APA.  The Court will set

24   aside and vacate the Biological Opinion on that basis.

25        The Court also declares that the Corps violated the ESA and APA by failing to

26   consult with the USFWS regarding potential impacts on the giant garter snake, and

27   issuance of the Stonegate permit is unlawful to the extent it relies on the parties'

28   failure to consult.  The Court hereby enjoins any implementation of the Proposed

1    Project pending completion of a legally adequate Biological Opinion and consultation

2    regarding the giant garter snake.

3

4        IT IS SO ORDERED.

5    Dated:    **July 17, 2025**

6                                                                    Hon. Daniel J. Calabretta
                                                                    UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14    DJC5 – CBD 221cv01527.msj

15

16

17

18

19

20

21

22

23

24

25

26

27

28